# KANSAS ET AL. *v.* UTILICORP UNITED INC.

No. 88–2109.   Argued April 16, 1990—Decided June 21, 1990

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and SCALIA, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACK-MUN, JJ., joined, *post*, p. 219.

*Thomas J. Greenan* argued the cause for petitioners. With him on the briefs were *Robert T. Stephan,* Attorney General of Kansas, *James E. Hurt, William L. Webster,* Attorney General of Missouri, *Donald D. Barry, William E. Quirk, Russell S. Jones, Jr.,* and *Thomas A. Sheehan.*

*Floyd R. Finch, Jr.,* argued the cause for respondent. With him on the brief was *Sally R. Burger.*

*Lawrence S. Robbins* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Rill, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Boudin, Stephen J. Marzen, Catherine G. O'Sullivan,* and *Jay C. Shaffer.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Illinois by *Neil F. Hartigan,* Attorney General, *Michael J. Hayes,* Deputy Attorney General, *Robert Ruiz,* Solicitor General, and *John W. McCaffrey* and *Christine Rosso,* Senior Assistant Attorneys General, *Bernard Nash, George Kaufmann,* and *Peter J. Kadzik;* for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Michael F. Brockmeyer, Ellen S. Cooper,* and *Alan M. Barr,* Assistant Attorneys General, *Don Siegelman,* Attorney General of Alabama, *Douglas B. Baily,* Attorney General of Alaska, and *Thomas E. Wagner,* Assistant Attorney General, *Robert K. Corbin,* Attorney General of Arizona, *Alison J. Butterfield, John Steven Clark,* Attorney General of Arkansas, *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, and *Sanford N. Gruskin,* Assistant Attorney General, *Duane Woodard,* Attorney General of Colorado, *Clarine Nardi Riddle,* Attorney General of Connecticut, and *Robert M. Langer* and *Steven M. Rutstein,* Assistant Attorneys General, *Charles M. Oberly III,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, and *George P. Shingler,* Senior Assistant Attorney General, *Warren Price III,* Attorney General of Hawaii, and *Robert A. Marks* and *Ted Gamble Clause,* Deputy Attorneys General, *James T. Jones,* Attorney General of Idaho, *Linley E. Pearson,* Attorney General of Indiana, and *Donna S. Nichols,* Deputy Attorney General, *Thomas J. Miller,* Attorney General of Iowa, and *John R. Perkins,* Deputy Attorney General, *Frederic J. Cowan,* Attorney General of Kentucky, and *James M. Ringo,* Assistant Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, and *Jesse James Marks* and

JUSTICE KENNEDY delivered the opinion of the Court.

Section 4 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 15, authorizes any person injured by a violation of

*Anne F. Benoit*, Assistant Attorneys General, *James E. Tierney*, Attorney General of Maine, and *Stephen L. Wessler*, Deputy Attorney General, *James M. Shannon*, Attorney General of Massachusetts, and *George K. Weber* and *Thomas M. Alpert*, Assistant Attorneys General, *Frank Kelly*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Stephen P. Kilgriff*, Deputy Attorney General, and *Thomas F. Pursell*, Assistant Attorney General, *Mike Moore*, Attorney General of Mississippi, *Marc Racicot*, Attorney General of Montana, *Robert M. Spire*, Attorney General of Nebraska, and *Dale A. Comer*, Assistant Attorney General, *Brian McKay*, Attorney General of Nevada, *John P. Arnold*, Attorney General of New Hampshire, and *Terry L. Robertson*, Senior Assistant Attorney General, *Robert J. Del Tufo*, Attorney General of New Jersey, and *Laurel A. Price*, Deputy Attorney General, *Robert Abrams*, Attorney General of New York, *O. Peter Sherwood*, Solicitor General, and *Lloyd A. Constantine*, Assistant Attorney General, *Lacy H. Thornburg*, Attorney General of North Carolina, *James C. Gulick*, Special Deputy Attorney General, and *K. D. Sturgis*, Assistant Attorney General, *Nicholas J. Spaeth*, Attorney General of North Dakota, and *David W. Huey*, Assistant Attorney General, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Dave Frohnmayer*, Attorney General of Oregon, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Eugene F. Waye*, Chief Deputy Attorney General, and *Carl S. Hisiro*, Senior Deputy Attorney General, *James E. O'Neil*, Attorney General of Rhode Island, *T. Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, and *Jeffrey P. Hallem*, Assistant Attorney General, *Charles W. Burson*, Attorney General of Tennessee, and *Barry Turner*, Assistant Attorney General, *Jim Mattox*, Attorney General of Texas, *Mary F. Keller*, First Assistant Attorney General, and *Allene D. Evans* and *Donna L. Nelson*, Assistant Attorneys General, *R. Paul Van Dam*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, and *Julie Brill*, Assistant Attorney General, *Mary Sue Terry*, Attorney General of Virginia, and *Frank Seales*, Assistant Attorney General, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Carol A. Smith*, Assistant Attorney General, *Roger W. Thompkins*, Attorney General of West Virginia, and *Dan Huck*, Deputy Attorney General, *Donald J. Hanaway*, Attorney General of Wisconsin, and *Kevin J. O'Connor*, Assistant Attorney General, *Joseph B. Meyer*, Attorney General of Wyoming, and *Robert H. Henry*, Attorney General of Oklahoma; for the

the antitrust laws to sue for treble damages, costs, and an attorney's fee. We must decide who may sue under § 4 when, in violation of the antitrust laws, suppliers overcharge a public utility for natural gas and the utility passes on the overcharge to its customers. Consistent with *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968), and *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), we hold that only the utility has the cause of action because it alone has suffered injury within the meaning of § 4.

## I

The respondent, UtiliCorp United Inc., an investor-owned public utility operating in Kansas and western Missouri, purchased natural gas from a pipeline company for its own use and for resale to its commercial and residential customers. Together with a second utility and several other gas purchasers, the respondent sued the pipeline company and five gas production companies in the United States District Court for the District of Kansas. The utilities alleged that the defendants had conspired to inflate the price of their gas in violation of the antitrust laws. They sought treble damages, pursuant to § 4 of the Clayton Act, for both the amount overcharged by the pipeline company and the decrease in sales to their customers caused by the overcharge.

The petitioners, the States of Kansas and Missouri, initiated separate § 4 actions in the District Court against the same defendants for the alleged antitrust violation. Acting as *parens patriae*, the petitioners asserted the claims of all natural persons residing within Kansas and Missouri who had purchased gas from any utility at inflated prices. They also

National Conference of State Legislatures et al. by *Benna Ruth Solomon, Beate Bloch, Robert L. Wald,* and *Richard M. Rindler;* and for Nancy Allevato et al. by *Richard E. Zuckerman, David B. Jaffe, Robert S. Harrison,* and *David N. Zacks.*

*Jeffrey I. Zuckerman, Daniel J. Popeo, Paul D. Kamenar,* and *John C. Scully* filed a brief for the Washingon Legal Foundation as *amicus curiae* urging affirmance.

asserted claims as representatives of state agencies, municipalities, and other political subdivisions that had purchased gas from the defendants. The District Court consolidated all of the actions.

The defendants, in their answer, asserted that the utilities lacked standing under § 4. They alleged that, pursuant to state and municipal regulations and tariffs filed with state regulatory agencies, the utilities had passed through the entire wholesale cost of the natural gas to their customers. As a result, the defendants contended, the utility customers had paid 100 percent of the alleged overcharge, and the utilities had suffered no antitrust injury as required by § 4.

The utilities moved for partial summary judgment with respect to this defense, and the District Court granted their motion. The court ruled that our decisions in *Hanover Shoe* and *Illinois Brick* controlled its interpretation of § 4. It read these cases to hold that a direct purchaser from an antitrust violator suffers injury to the full extent of an illegal overcharge even if it passes on some or all of the overcharge to its customers. The District Court concluded that utilities, as direct purchasers, had suffered antitrust injury, but that their customers, as indirect purchasers, had not.

In light of its ruling, the District Court chose to treat the partial summary judgment motion as a motion to dismiss the petitioners' *parens patriae* claims. It then granted this motion but allowed the petitioners to take an interlocutory appeal under 28 U. S. C. § 1292(b). It certified the following question to the Court of Appeals:

> "In a private antitrust action under 15 U. S. C. § 15 involving claims of price fixing against the producers of natural gas, is a State a proper plaintiff as *parens patriae* for its citizens who paid inflated prices for natural gas, when the lawsuit already includes as plaintiffs those public utilities who paid the inflated prices upon direct purchase from the producers and who subsequently passed on most or all of the price increase to the citizens

of the State?" *In re Wyoming Tight Sands Antitrust Cases*, 695 F. Supp. 1109, 1120 (Kan. 1988).

The Court of Appeals answered the question in the negative. It agreed with the District Court that *Hanover Shoe* and *Illinois Brick* required dismissal of the *parens patriae* claims. See *In re Wyoming Tight Sands Antitrust Cases*, 866 F. 2d 1286, 1294 (CA10 1989). We granted certiorari to resolve a conflict between this decision and *Illinois ex rel. Hartigan* v. *Panhandle Eastern Pipe Line Co.*, 852 F. 2d 891 (CA7 1988) (en banc). 493 U. S. 1041 (1990). We now affirm.

## II

Section 4 of the Clayton Act provides in full:

"[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15(a).

As noted by the District Court and the Court of Appeals, we have applied this section in two cases involving allegations that a direct purchaser had passed on an overcharge to its customers.

In *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, *supra*, Hanover alleged that United had monopolized the shoe manufacturing machinery industry in violation of § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 2. It sought treble damages under § 4 of the Clayton Act for overcharges paid in leasing certain machinery from United. United defended, in part, on the ground that Hanover had passed on the overcharge to its customers and, as a result, had suffered no injury. We rejected the defense for two reasons. First, noting that a wide range of considerations may influence a company's pricing decisions, we concluded that

establishing the amount of an overcharge shifted to indirect purchasers "would normally prove insurmountable." 392 U. S., at 493. Second, we reasoned that a pass-on defense would reduce the effectiveness of § 4 actions by diminishing the recovery available to any potential plaintiff. See *id.*, at 494.

In *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), we applied these considerations to reach a similar result. The State of Illinois sued Illinois Brick and other concrete block manufacturers for conspiring to raise the cost of concrete blocks in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. We ruled that the State had suffered no injury within the meaning of § 4 because Illinois Brick had not sold any concrete blocks to it. The company, instead, had sold the blocks to masonry subcontractors, who in turn had sold them to the State's general contractors. We decided that, because Illinois Brick could not use a pass-on defense in an action by direct purchasers, it would risk multiple liability to allow suits by indirect purchasers. See 431 U. S., at 730–731. We declined to overrule *Hanover Shoe* or to create exceptions for any particular industries. See 431 U. S., at 735–736, 744–745.

Like the State of Illinois in *Illinois Brick*, the consumers in this case have the status of indirect purchasers. In the distribution chain, they are not the immediate buyers from the alleged antitrust violators. They bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of the gas. Unless we create an exception to the direct purchaser rule established in *Hanover Shoe* and *Illinois Brick*, any antitrust claim against the defendants is not for them, but for the utilities to assert.

The petitioners ask us to allow them to press the consumers' claims for three reasons. First, they assert that none of the rationales underlying *Hanover Shoe* or *Illinois Brick* exist in cases involving regulated public utilities. Second, they argue that we should apply an exception, suggested in

*Illinois Brick*, for actions based upon cost-plus contracts. Third, they maintain that § 4C of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 90 Stat. 1394, as amended, 15 U. S. C. § 15c, authorizes them to assert claims on behalf of utility customers even if the customers could not assert any claims themselves. Affirming the Court of Appeals, we reject each of these contentions in turn.

## III

The petitioners assert that we should allow indirect purchaser suits in cases involving regulated public utilities that pass on 100 percent of their costs to their customers. They maintain that our concerns in *Hanover Shoe* and *Illinois Brick* about the difficulties of apportionment, the risk of multiple recovery, and the diminution of incentives for private antitrust enforcement would not exist in such cases. We disagree. Although the rationales of *Hanover Shoe* and *Illinois Brick* may not apply with equal force in all instances, we find it inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities.

## A

The direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers. See *Hanover Shoe*, 392 U. S., at 493; *Illinois Brick, supra*, at 740–742; *Blue Shield of Va.* v. *McCready*, 457 U. S. 465, 475, n. 11 (1982). The petitioners find the rule unnecessary, in this respect, when a utility passes on its costs to its customers pursuant to state regulations or tariffs filed with a utility commission. In such cases, they assert, the customers pay the entire overcharge, obviating litigation over its apportionment. They maintain that they can prove the exact injury to the residential customers whom they represent because the respondent made periodic public filings showing the volume and price of gas that it sold to these consumers. They ask us to allow them to sue for

the entire amount of the overcharge and to limit the respondent's recovery to damages for its lost business.

The petitioners have oversimplified the apportionment problem in two respects. First, an overcharge may injure a utility, apart from the question of lost business, even if the utility raises its rates to offset its increased costs. As we explained in *Hanover Shoe:*

> "The mere fact that a price rise followed an unlawful cost increase does not show that the sufferer of the cost increase was undamaged. His customers may have been ripe for his price rise earlier; if a cost rise is merely the occasion for a price increase a businessman could have imposed absent the rise in his costs, the fact that he was earlier not enjoying the benefits of the higher price should not permit the supplier who charges an unlawful price to take those benefits from him without being liable for damages. This statement merely recognizes the usual principle that the possessor of a right can recover for its unlawful deprivation whether or not he was previously exercising it." 392 U. S., at 493, n. 9.

In other words, to show that a direct purchaser has borne no portion of an overcharge, the indirect purchaser would have to prove, among other things, that the direct purchaser could not have raised its rates prior to the overcharge.

In *Hanover Shoe,* however, we decided not to allow proof of what the direct purchaser might have done because of the "nearly insuperable difficulty" of the issue. *Id.,* at 493. The petitioners assume that the presence of state regulation would make the proof less difficult here. We disagree. The state regulation does not simplify the problem but instead imports an additional level of complexity. To decide whether a utility has borne an overcharge, a court would have to consider not only the extent to which market conditions would have allowed the utility to raise its rates prior to the overcharge, as in the case of an unregulated business, but also what the state regulators would have allowed. In particu-

lar, to decide that an overcharge did not injure a utility, a court would have to determine that the State's regulatory schemes would have barred any rate increase except for the amount reflected by cost increases. Proof of this complex preliminary issue, one irrelevant to the liability of the defendant, would proceed on a case-by-case basis and would turn upon the intricacies of state law.

From the certified question in this case, we do not know whether the respondent could have raised its prices prior to the overcharge. Its customers may have been willing to pay a greater price, and the Kansas and Missouri regulators may have allowed a rate increase based on factors other than strict costs. See *Midwest Gas Users Assn.* v. *State Corporation Comm'n*, 5 Kan. App. 2d 653, 661, 623 P. 2d 924, 931 (1981); *State ex rel. Associated Natural Gas Co.* v. *Public Service Comm'n*, 706 S. W. 2d 870, 879–880 (Mo. App. 1985). To the extent that the respondent could have sought and gained permission to raise its rates in the absence of an overcharge, at least some portion of the overcharge is being borne by it; whether by overcharge or by increased rates, consumers would have been paying more for natural gas than they had been paying in the past. Because of this potential injury, the respondent must remain in the suit. If we were to add indirect purchasers to the action, we would have to devise an apportionment formula. This is the very complexity that *Hanover Shoe* and *Illinois Brick* sought to avoid.

Second, difficult questions of timing might necessitate apportioning overcharges if we allowed indirect suits by utility customers. Even if, at some point, a utility can pass on 100 percent of its costs to its customers, various factors may delay the passing-on process. Some utilities must seek approval from the governing regulators prior to raising their rates. Other utilities, pursuant to purchase gas adjustment clauses (PGA's) filed with state regulators, may adjust their rates to reflect changes in their wholesale costs according to prearranged formulas without seeking regulatory approval in

each instance. Yet, even utilities that use PGA's often encounter some delay. See Brief for State of Illinois as *Amicus Curiae* 9, n. 11 (describing the various time lags under a typical PGA between the increase in a utility's wholesale costs and the rise in consumer rates). During any period in which a utility's costs rise before it may adjust its rates, the utility will bear the costs in the form of lower earnings. See S. Breyer, Regulation and its Reform 48–49 (1982). Even after the utility raises its rates, moreover, the pass-through process may take time to complete. During this time, the utility and its customers each would pay for some of the increased costs.

In this case, we could not deprive the respondent of its § 4 action without first determining that the passing-on process in fact had allowed it to shift the entire overcharge to its customers. The certified question, however, leaves unclear whether the respondent had passed on "most or all" of its costs at the time of the suit. In addition, even the means by which the passthrough occurred remain unsettled. The petitioners allege that, pursuant to formulas in PGA's filed with the Kansas Corporation Commission and the Missouri Public Service Commission, the respondent "automatically" adjusted some of its rates to reflect increases in the wholesale cost of gas. Brief for Petitioners 5, n. 5. The respondent, however, maintains that PGA's did not govern all of its sales. See Brief for Respondent 17. The difficulties posed by issues of this sort led us to adopt the direct purchaser rule, and we must decline to create an exception that would require their litigation. As we have stated before: "[T]he task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system." *McCready*, 457 U. S., at 475, n. 11.

In addition to these complications, the regulation of utilities itself may make an exception to *Illinois Brick* unnecessary. Our decisions in *Hanover Shoe* and *Illinois Brick* often deny relief to consumers who have paid inflated prices

because of their status as indirect purchasers. See 2 P. Areeda & D. Turner, Antitrust Law § 337e, pp. 193–194 (1978); Harris & Sullivan, Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis, 128 U. Pa. L. Rev. 269, 342 (1979). Although one might criticize *Illinois Brick* for this consequence in other circumstances, the criticism may have less validity in the context of public utilities. Both the Court of Appeals in this case and the Seventh Circuit in *Illinois ex rel. Hartigan* v. *Panhandle Eastern Pipe Line Co.*, 852 F. 2d 891 (1988), have suggested that state regulators would require the utilities to pass on at least some of the recovery obtained in a § 4 suit. See *Wyoming Tight Sands*, 866 F. 2d, at 1291; *Panhandle Eastern, supra*, at 895. State regulators have followed this approach elsewhere. See, *e. g.*, *Louisiana Power & Light Co.*, *Ex Parte*, Nos. U–17906, U–12636, U–17649, 1989 La. PUC LEXIS 3, *31–*32 (Mar. 1, 1989) (requiring Louisiana Power & Light Co., which won a $190 million judgment against United Gas Pipe Line Co., to flow the proceeds back to ratepayers through reduced rates over a 5-year period). If Kansas and Missouri impose similar requirements, then even if the customers cannot sue the alleged antitrust violaters, they may receive some of the compensation obtained by the respondent. Creating an exception to allow apportionment in violation of *Illinois Brick* would make little sense when, in light of all its difficulty, its practical significance is so diminished.

## B

The *Illinois Brick* rule also serves to eliminate multiple recoveries. See *Illinois Brick*, 431 U. S., at 730–731; *McCready, supra*, at 474. The petitioners assert that no risk of multiple recovery would exist here, if we allowed them to sue, because the direct and indirect purchasers would be seeking different, not duplicative, damages; the petitioners would recover the amount of the overcharge and the utilities would recover damages for their lost sales. Leaving

aside the apportionment issue, we reject the argument in this case, just as we did in *Illinois Brick*. Bringing all classes of direct and indirect purchasers together in a single lawsuit may reduce the risk of multiple recovery, but the reduction comes at too great a cost. See *Illinois Brick, supra,* at 731, n. 11.

This case already has become quite complicated. It involves numerous utilities and other companies operating in several States under federal, state, and municipal regulation and, in some instances, under no rate regulation at all. Even apart from gas sold to customers, the utilities seek damages for lost sales and for gas purchased for their own use. The petitioners, in addition to their *parens patriae* claims, are asserting direct claims on behalf of numerous state agencies. Other direct purchasers also seek several measures of damages. Allowing the petitioners to proceed on behalf of consumers would complicate the proceedings further. Even if they could represent consumers residing in Kansas and Missouri, they could not represent industrial and commercial purchasers or consumers from other States. See 15 U. S. C. § 15c(a)(1) (extending *parens patriae* representation only to resident natural persons). These unrepresented consumers might seek intervention and further delay the prompt determination of the suit. The expansion of the case would risk the confusion, costs, and possibility of error inherent in complex litigation. At the same time, however, it might serve little purpose because, as noted above, state regulatory law may provide appropriate relief to consumers even if they cannot sue under § 4. As in *Illinois Brick*, we continue to believe that "even if ways could be found to bring all potential plaintiffs together in one huge action, the complexity thereby introduced into treble-damages proceedings argues strongly for retaining the *Hanover Shoe* rule." 431 U. S., at 731, n. 11.

## C

We have maintained, throughout our cases, that our interpretation of § 4 must promote the vigorous enforcement of the antitrust laws. See *Hanover Shoe*, 392 U. S., at 493; *Illinois Brick*, *supra*, at 746; *McCready*, 457 U. S., at 475, n. 11; *California* v. *ARC America Corp.*, 490 U. S. 93, 102, n. 6 (1989). If we were convinced that indirect suits would secure this goal better in cases involving utilities, the argument to interpret § 4 to create the exception sought by the petitioners might be stronger. On balance, however, we do not believe that the petitioners can prevail in this critical part of the case. The petitioners assert that utilities, such as the respondent, lack the incentive to prosecute § 4 cases for two reasons. First, they state that utilities, by law, may pass on their costs to customers. Second, they surmise that utilities might have to pass on damages recovered in a § 4 action. In other words, according to the petitioners, utilities lose nothing if they do not sue and gain nothing if they do sue. In contrast, the petitioners maintain, the large aggregate claims of residential consumers will give state attorneys general ample motivation to sue in their capacity as *parens patriae*.

The petitioners' argument does not persuade us that utilities will lack incentives to sue overcharging suppliers. Utilities may bring § 4 actions in some instances for fear that regulators will not allow them to shift known and avoidable overcharges on to their customers. See Kan. Stat. Ann. § 66–128a (1985) (allowing the state commission to "review and evaluate the efficiency or prudence of any actions . . . of any public utility or common carrier for the purpose of establishing fair and reasonable rates"); Mo. Rev. Stat. § 393.150 (1986) (interpreted in *State ex rel. Associated Natural Gas Co.* v. *Public Service Comm'n*, 706 S. W. 2d 870, 879–880 (Mo. App. 1985), to give regulators "considerable discretion" in setting gas rates). In addition, even if state law would require a utility to reimburse its customers for recovered overcharges, a utility may seek treble damages in a § 4 action.

The petitioners have cited no authority indicating that a victorious utility would have to pay the entire exemplary portion of these damages to its customers.

Utilities, moreover, have an established record of diligent antitrust enforcement, having brought highly successful § 4 actions in many instances. The well-known group of actions from the 1960's involving overcharges for electrical generating equipment provides an excellent example. In these cases, which involved "a series of horizontal price-fixing conspiracies characterized as the most shocking in the history of the Sherman Act, plaintiff utilities . . . recover[ed] in unprecedented sums" even though some of the utilities "passed on to their own customers whatever higher costs they incurred as a consequence of the alleged conspiracies." Pollock, Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine, 32 A. B. A. Antitrust L. J. 5, 10–11 (1966). The courts in these suits, even before the *Hanover Shoe* and *Illinois Brick* decisions, considered the pass-on issue and held that the causes of action were for the utilities to assert. See, *e. g., Commonwealth Edison Co.* v. *Allis-Chalmers Mfg. Co.,* 335 F. 2d 203, 208 (CA7 1964); *Ohio Valley Electric Corp.* v. *General Electric Co.,* 244 F. Supp. 914, 949–951 (SDNY 1965). Various factors may have prompted these and other utility actions. For example, in addition to the reasons stated above, the respondent asserts that, like any business, an investor-owned utility has an interest in protecting its market. But whatever the motivation for their § 4 suits, this history makes us quite hesitant to take from the utilities the responsibility for enforcing the antitrust laws.

Relying on indirect purchaser actions in utility cases might fail to promote antitrust enforcement for other reasons. Consumers may lack the expertise and experience necessary for detecting improper pricing by a utility's suppliers. See Landes & Posner, The Economics of Passing On: A Reply to Harris and Sullivan, 128 U. Pa. L. Rev. 1274, 1278–1279 (1980). Although state attorneys general have greater ex-

pertise, they may hesitate to exercise the *parens patriae* device in cases involving smaller, more speculative harm to consumers. See Landes & Posner, Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of *Illinois Brick*, 46 U. Chi. L. Rev. 602, 613 (1979). See also *Illinois Brick*, 431 U. S., at 745 (stating that, in indirect actions, "the uncertainty of how much of an overcharge could be established . . . [and] the uncertainty of how that overcharge would be apportioned . . . would further reduce the incentive to sue"). And even when state attorneys general decide to bring *parens patriae* actions, they may sue only on behalf of resident natural persons. See 15 U. S. C. § 15c(a)(1). All others, including nonresidents and small businesses, might fail to enforce their claims because of the insignificance of their individual recoveries. For these reasons, we remain unconvinced that the exception sought by the petitioners would promote antitrust enforcement better than the current *Illinois Brick* rule.

## D

The preceding conclusions bring us to a broader point. The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to "carve out exceptions to the [direct purchaser] rule for particular types of markets." *Illinois Brick*, 431 U. S., at 744. The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule. As we have stated:

> "[T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same 'massive evidence and complicated theo-

ries' into treble-damages proceedings, albeit at a somewhat higher level of generality." *Id.*, at 744–745.

In sum, even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4.

## IV

The suggestion in *Hanover Shoe* and *Illinois Brick* that a departure from the direct purchaser rule may be necessary when an indirect purchaser buys under a pre-existing cost-plus contract does not justify an exception in this case. In *Hanover Shoe*, we stated:

"We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." 392 U. S., at 494.

We observed further in *Illinois Brick:*

"In [a cost-plus contract] situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." 431 U. S., at 736.

The petitioners argue that the regulations and tariffs requiring the respondent to pass on its costs to the consumers place this case within the cost-plus contract exception. We disagree.

The respondent did not sell the gas to its customers under a pre-existing cost-plus contract. Even if we were to create an exception for situations that merely resemble those governed by such a contract, we would not apply the exception here. Our statements above show that we might allow indirect purchasers to sue only when, by hypothesis, the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury. That certainty does not exist here.

The utility customers made no commitment to purchase any particular quantity of gas, and the utility itself had no guarantee of any particular profit. Even though the respondent raised its prices to cover its costs, we cannot ascertain its precise injury because, as noted above, we do not know what might have happened in the absence of an overcharge. In addition, even if the utility customers had a highly inelastic demand for natural gas, see *Panhandle Eastern*, 852 F. 2d, at 895, the need to inquire into the precise operation of market forces would negate the simplicity and certainty that could justify a cost-plus contract exception. See *Illinois Brick, supra*, at 742; P. Areeda & H. Hovencamp, Antitrust Law § 337.3c, pp. 323–324 (Supp. 1988). Thus, although we do not alter our observations about the possibility of an exception for cost-plus contracts, we decline to create the general exception for utilities sought by the petitioners.

V

The petitioners, in their final argument, contend that § 4C of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 90 Stat. 1394, as amended, 15 U. S. C. § 15c, authorizes them to sue on behalf of consumers even though the consumers, as indirect purchasers, have no cause of action of their own. Section 4C(a)(1) provides in relevant part:

> "Any attorney general of a State may bring a civil action in the name of such state as parens patriae on behalf of natural persons residing in such State . . . to secure monetary relief as provided in this section for injury sus-

tained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title." 15 U. S. C. § 15c(a)(1).

Because the Act, in their view, has the clear purpose of protecting consumers, see Kintner, Griffin, & Goldston, The Hart-Scott-Rodino Antitrust Improvements Act of 1976: An Analysis, 46 Geo. Wash. L. Rev. 1, 23 (1977), the petitioners contend that it must allow the States to sue on behalf of consumers notwithstanding their status as indirect purchasers.

We have rejected this argument before. We stated in *Illinois Brick* that § 4C did not establish any new substantive liability. Instead, "[i]t simply created a new procedural device—*parens patriae* actions by States on behalf of their citizens—to enforce existing rights of recovery under § 4 [of the Clayton Act]." 431 U. S., at 734, n. 14. Section 4, as noted above, affords relief only to a person "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U. S. C. § 15(a). State attorneys general may bring actions on behalf of consumers who have such an injury. See, *e. g.*, *Pennsylvania* v. *Mid-Atlantic Toyota Distributors, Inc.*, 704 F. 2d 125, 128 (CA4 1983) (suit on behalf of consumers injured by an alleged conspiracy to fix the price of cars). But here the respondent is the injured party under the antitrust laws, and the predicate for a *parens patriae* action has not been established. We conclude that the petitioners may not assert any claims on behalf of the customers.

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

I dissent from the Court's opinion and judgment because it is inappropriate for the Court to deny standing to sue under § 4 of the Clayton Act, 15 U. S. C. § 15, to customers of a regulated utility in circumstances such as those presented in this case. By its plain language, § 4 reflects an "'expansive re-

medial purpose.'" *Blue Shield of Va.* v. *McCready,* 457 U. S. 465, 472 (1982) (citation omitted). It does not distinguish between classes of customers, but rather grants a cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U. S. C. § 15(a). In enacting § 4, Congress sought to ensure that victims of anticompetitive conduct receive compensation. *Blue Shield, supra,* at 472; *Pfizer Inc.* v. *India,* 434 U. S. 308, 314 (1978).

In *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720 (1977), we held that certain indirect purchasers of concrete block lacked standing to challenge the manufacturer's business practices under the antitrust laws because they could not be deemed to have suffered injury from the alleged illegal conduct. This suit, however, is very different from *Illinois Brick.* That case involved a competitive market where concrete block manufacturers sold to masonry contractors who in turn sold to general contractors who in turn sold to the *Illinois Brick* respondents; this case involves a highly regulated market where utilities possessing natural monopolies purchase gas from natural gas suppliers and then sell the gas to residential customers. *Illinois Brick* did not hold that, in all circumstances, indirect purchasers lack § 4 standing. Indeed, just last Term we observed that under *Illinois Brick* "indirect purchasers might be allowed to bring suit in cases in which it would be easy to prove the extent to which the overcharge was passed on to them." *California* v. *ARC America Corp.,* 490 U. S. 93, 102, and n. 6 (1989). See also *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.,* 392 U. S. 481, 494 (1968).

The issue in this case is whether *Illinois Brick* bars a suit by retail customers to whom the utilities have passed on the entire cost of the gas sold to them, including any illegal overcharge. Before the District Court, the utilities moved to dismiss the States as *parens patriae,* arguing that the States lacked standing because they represented indirect purchas-

ers. In response, the States contended that the indirect purchasers were proper plaintiffs because the utilities had passed through the entire overcharge to their residential customers. The District Court found it unnecessary "to wait upon evidence establishing the degree to which the utilities passed on the overcharge," *In re Wyoming Tight Sands Antitrust Cases*, 695 F. Supp. 1109, 1116 (Kan. 1988), for even accepting the States' position that there had been a total pass-on, decisions of this Court were thought to bar the suit. Likewise, in affirming the District Court, the Court of Appeals presumed a "perfect and provable pass-on of the allegedly illegal overcharge." *In re Wyoming Tight Sands Antitrust Cases*, 866 F. 2d 1286, 1293 (CA10 1989). Indeed, the vice president and general counsel of one of the respondent utilities is on record as stating that the utility's customers "pay *all* of any increases in the cost of natural gas [Kansas Power & Light] must purchase to serve them." Affidavit of David S. Black, Vice President and General Counsel of the Kansas Power & Light Company, Record, Doc. No. 485, Exhibit D (emphasis in original). Rather than embarking, as the Court does, on what amounts to a factfinding mission, which the courts below eschewed, about the fact and provability of this pass-on, we should decide this case on the basis that there has been a complete passthrough of the overcharge. On that basis, it is evident that the concerns underlying the decision in *Illinois Brick* do not support the judgment below. Rather, we should follow the plain intent of § 4 that the victims of anticompetitive conduct be allowed the remedy provided by the section.

*Illinois Brick* barred indirect purchaser suits chiefly because we feared that permitting the use of pass-on theories under § 4 would transform these treble-damages actions into massive and inconclusive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. 431 U. S., at 737. As Judge Posner has

written: "The optimal adjustment by an unregulated firm to the increased cost of the input will always be a price increase smaller than the increase in input cost, and this means that the increased cost will be divided between the two tiers, the direct and indirect purchasers—but in what proportion will often be hard to determine, even by sophisticated techniques of economic analysis. This is a central insight of the *Illinois Brick* decision." *Illinois ex rel. Hartigan* v. *Panhandle Eastern Pipe Line Co.*, 852 F. 2d 891, 894 (CA7 1988).

In this case, however, it is regulation rather than market forces that determines the amount of overcharge that the utility passes through to its residential customers. The rates of utilities are determined by law and are set at a level designed to allow a fair return on a rate base that includes the cost of furnishing the service, plainly including in this case the cost of gas purchased from the pipelines and resold to customers. It is fanciful, at least unrealistic, to think that a utility entitled to pass on to its customers the cost of gas that it has purchased will not do so to the maximum extent permitted by law. Furthermore, petitioners assert that in this case the applicable law requires that such cost be passed on to consumers. And, as we have said, the Tenth Circuit opinion reflects the likelihood of a perfect and provable pass-on.

Of course, to recover in a case like this, the plaintiff must prove that the utility paid the pipelines an illegally high price and must demonstrate the amount of the overcharge. That amount is included in the rates charged by the utility and hence is passed through to the consumer. The result is that determining the injury inflicted on consumers involves nothing more than reading their utility bills, which reveal the amount of gas purchased by them at a price which includes the amount of the illegal overcharge passed through to them. Where it is clear that the entire overcharge is passed through, there can be no claim that indirect purchasers can-

not prove the extent of their damage caused by a rate calculated on a rate base inflated by an illegal price paid for gas.

The Court contends that the apportionment problem is not so simple. It maintains that, even where a utility raises its rates to compensate for the overcharge and passes the overcharge through to the indirect purchasers, an apportionment problem still exists because "to show that a direct purchaser has borne no portion of an overcharge, the indirect purchaser would have to prove, among other things, that the direct purchaser could not have raised its rates prior to the overcharge." *Ante*, at 209. The problem identified by the majority is not peculiar to indirect purchaser suits. In antitrust cases where suppliers increase their prices, courts frequently must separate the price increase attributable to anticompetitive conduct (*i. e.*, the "overcharge") from the price increase attributable to legitimate factors. This type of calculation "has to be done in every case where the plaintiff claims to have lost sales because of the defendant's unlawful conduct and the defendant argues that the loss was due partly or entirely to other factors." *Panhandle Eastern, supra*, at 897; see *Bigelow* v. *RKO Radio Pictures, Inc.*, 327 U. S. 251 (1946). The problem identified in *Illinois Brick* was entirely different: There, we were concerned that it would unduly complicate litigation to require courts to separate the portion of the overcharge absorbed by the direct purchaser from the portion of the overcharge passed onto the indirect purchaser. As argued above, this difficulty is not a concern in the present case.* It is at least very doubtful that a utility that is

---

*The majority also suggests that "difficult questions of timing might necessitate apportioning overcharges if we allowed indirect suits by utility customers. Even if, at some point, a utility can pass on 100 percent of its costs to its customers, various factors may delay the passing-on process." *Ante*, at 210. This suggestion, as indicated by the words "might" and "may," is quite speculative. It is much more realistic to believe that sooner or later, the customer will foot the cost of overpriced gas. If timing was such a problem, the Tenth Circuit would not have assumed a "perfect and provable" passthrough.

in position to secure a rate increase on grounds having nothing to do with the price paid for its gas would fail to request a rate increase that included as well the entire amount paid for gas purchased from pipelines and sold to consumers.

*Illinois Brick* also observed that granting standing to the indirect purchasers in that case would lead to the under-enforcement of the antitrust laws. 431 U. S., at 745–747. In the cases where there is "a perfect and provable passthrough," however, the opposite is true for two reasons. First, because the passthrough of the overcharge is complete and easily demonstrated, the indirect purchasers—and the States in their *parens patriae* capacity—may readily discover their injury. Second, although the utility could sue to recover lost profits resulting from lost sales due to the illegally high price, its injury is not measured by the amount of the illegal overcharge that it has passed on, and hence the utility would have no incentive to seek such a recovery.

The majority suggests that, even where a utility passes the entire overcharge through to the indirect customers, the utility nonetheless might actively prosecute antitrust claims because the state regulatory commission may allow the utility to keep any damages that the utility recovers. But the utility commissions cannot allow an antitrust recovery forbidden by federal law. Given a passthrough, the customer, not the utility, suffers the antitrust injury, and it is the customer or the State on his behalf that is entitled to recover treble damages. In any event, it seems to me that the majority conjures up a very strange utility commission, the possible existence of which the court fails to document.

A third consideration prompting our decision in *Illinois Brick* was our belief that permitting indirect purchaser suits might subject antitrust defendants to multiple liability. *Id.*, at 730–731. Again however, where there is a "perfect and provable" passthrough, there is no danger that both the utilities and the indirect purchasers will recover damages for the same anticompetitive conduct because the utili-

ties have not suffered any overcharge damage: The petitioners will sue for the amount of the overcharge, while the utilities will sue for damages resulting from their lost sales.

The majority argues that, even "[l]eaving aside the apportionment issue" (*i. e.*, assuming that there is no apportionment difficulty as the Tenth Circuit did in affirming summary judgment), the multiple recovery problem identified in *Illinois Brick* still exists. *Ante*, at 212–213. I disagree. *Illinois Brick* "focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *Blue Shield*, 457 U. S., at 474–475. The danger of multiple recoveries does not exist aside from the apportionment difficulty; rather, it stems from it. If only defensive use of a pass-through defense were barred, or if it were extremely difficult to ascertain the percentage of an overcharge that the utility passed through, then the supplier of natural gas might potentially have to pay overlapping damages to successive purchasers at different levels in the distribution chain. But where there is no apportionment difficulty, there is no comparable risk.

In sum, I cannot agree with the rigid and expansive holding that in no case, even in the utility context, would it be possible to determine in a reliable way a passthrough to consumers of an illegal overcharge that would measure the extent of their damage. There may be cases, as the Court speculates, where there would be insuperable difficulties. But we are to judge this case on the basis that the pass-through is complete and provable. There have been no findings below that this is not the fact. Instead, the decision we review is that consumers may not sue even where it is clear and provable that an illegal overcharge has been passed on to them and that they, rather than the utility, have to that extent been injured.

None of the concerns that caused us to bar the indirect purchaser's suit in *Illinois Brick* exist in this case. For that

reason, rather than extending the *Illinois Brick* exception to § 4's grant of a cause of action to persons injured through anticompetitive conduct, I would hold that the petitioners in this case have standing to sue. This result would promote the twin antitrust goals of ensuring recompense for injured parties and encouraging the diligent prosecution of antitrust claims.