**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-3122
_____

IN RE: HYPODERMIC PRODUCTS ANTITRUST LITIGATION


AMERICAN SALES COMPANY, INC; SAJ DISTRIBUTORS, INC;
LOUISIANA WHOLESALE DRUG CO INC; ROCHESTER DRUG CO-OP
INC; JM SMITH CORPORATION; DIK DRUG; PARK SURGICAL CO., INC.,
Petitioners
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 2-05-cv-01602
District Judge: The Honorable Jose L. Linares


Argued May 17, 2012

Before: SMITH and FISHER, *Circuit Judges*
and STEARNS, *District Judge*[*]

(Filed:June 5, 2012)

---

[*] The Honorable Richard G. Stearns, United States District Judge for the United States District Court of Massachusetts, sitting by designation.

Elena K. Chan, Esq.
Bruce E. Gerstein, Esq. (argued)
Garwin Gerstein & Fisher
1501 Broadway
Suite 1416
New York, NY 10036

Eric L. Cramer, Esq.
Daniel Berger, Esq.
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103

Peter Kohn, Esq.
Richard D. Schwartz, Esq.
Faruqi & Faruqi
101 Greenwood Avenue
Suite 600
Jenkintown, PA 19046

Peter S. Pearlman, Esq.
Cohn, Lifland, Pearlman, Hermann & Knopf
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663

Thomas M. Sobol, Esq.
Hagens Berman Sobol Shapiro
One Main Street
4th Floor
Cambridge, MA 02142

Howard J. Serdan, Esq.
Levin, Fishbein, Sedran & Berman
510 Walnut Street
Suite 500
Philadelphia, PA 19106
        *Counsel for Distributor Petitioners-Appellants*

James V. Bashian, Esq.
4th Floor
70 Adams Street
Hoboken, NJ 07030

Thomas S. Biemer, Esq.
James J. Rodgers, Esq.
Holly R. Rogers, Esq.
Dilworth Paxson
1500 Market Street
Suite 3500E
Philadelphia, PA 19102

Karin E. Fisch, Esq.
Abbe, Spanier, Rodd & Abrams
212 East 39th Street
New York, NY 10016

Torsten M. Kracht, Esq.
Todd M. Stenerson, Esq.
Richard L. Wyatt, Jr., Esq. (argued)
Hunton & Williams
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

R. Laurence Macon, Esq.
Akin, Gump, Strauss, Hauer & Feld
300 Convent Street
Suite 1500
San Antonio, TX 78205

Kenneth A. Wexler, Esq.
Wexler Wallace
55 West Monroe Street
Chicago, IL 60603
        *Counsel for Healthcare Provider Appellees*

Robert A. Atkins, Esq.
Steven C. Herzog, Esq.
Jacqueline P. Rubin, Esq.
Hannah S. Sholl, Esq.
Moses Silverman, Esq. (argued)
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

R. Dale Grimes, Esq.
Bass, Berry & Sims
2700 First American Center
315 Deaderick Street
Nashville, TN 37238

Megan E. Hiorth, Esq.
Gregory B. Reilly, Esq.
Gavin J. Rooney, Esq.
Scott L. Walker, Esq.
Lowenstein Sandler
65 Livingston Avenue
Roseland, NJ 07068

Ellen B. Unger, Esq.
Apartment 306
48 South Park Street
Montclair, NJ 07042
*Counsel for Becton Dickinson Co. Appellee*

---

## OPINION

---

SMITH, *Circuit Judge.*

This appeal entails a consolidated class action involving two groups of plaintiffs alleging that defendant-appellee Becton Dickinson & Co. ("Becton"), a manufacturer of hypodermic products,[1] violated the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. The two plaintiffs' groups are: (i) distributors of Becton's hypodermic products ("Distributors");[2] and (ii) certain hospitals and clinics that purchase Becton's hypodermic products ("Healthcare Providers")[3] (collectively, Distributors and Healthcare Providers are the "Plaintiffs").[4] The discrete issue on appeal is which group of Plaintiffs, Distributors or Healthcare Providers, has standing under the direct-purchaser rule to pursue the federal antitrust claims related to the contract sales of Becton's hypodermic

---

[1] The hypodermic products are the following devices and their associated needles: disposable syringes; blood collection devices; winged IV devices; and IV catheter devices.

[2] The Distributors, who are the plaintiff-appellants, are: American Sales Co., Inc.; Dik Drug Co.; J M Smith Corp.; Louisiana Wholesale Drug Co., Inc.; Park Surgical Co., Inc.; Rochester Drug Co-Operative, Inc.; and SAJ Distributors, Inc.

[3] The Healthcare Providers, who are the plaintiff-appellees, are: MedStar Health Inc.; MedStar-Georgetown Medical Center, Inc.; National Rehabilitation Hospital, Inc.; and Washington Hospital Center Corporation.

Other plaintiff healthcare providers, such as Hebrew Home for the Aged, chose not to participate as appellees. Nonetheless, this decision applies to all plaintiff healthcare providers in this action, regardless of whether they chose to respond as appellees in this appeal.

[4] The Healthcare Providers claim that there is a third group of plaintiffs, the indirect purchasers (e.g., retail pharmacies), but that group has not asserted any issues on appeal.

products. The District Court ruled on summary judgment that Healthcare Providers, not Distributors, were the direct purchasers and have exclusive standing to pursue these claims. We will reverse.

## I. BACKGROUND

### A. BECTON'S DISTRIBUTION OF HYPODERMIC PRODUCTS

Plaintiffs allege that Becton maintained a dominant share of the markets for the hypodermic products, employed various anticompetitive practices to eliminate competition and achieve monopoly positions in the relevant markets, and utilized these advantages to charge purchasers higher prices. Although Becton sells the hypodermic products through two channels (i.e., contract sales and non-contract sales), only Becton's contract sales are at issue here.

#### 1. CONTRACT SALES

Contract sales, which account for approximately 74% of Becton's sales, involve three primary contracts: a Net Dealer Contract ("NDC"); a Distribution Agreement; and a Dealer Notification Agreement ("DNA").

*Net Dealer Contract*

NDCs are agreements between a manufacturer of medical products and a group purchasing organization ("GPO"). GPOs are entities that negotiate prices of products and other terms and conditions on behalf of their member healthcare providers. GPOs do not purchase or sell any products themselves. By negotiating on behalf of many healthcare providers, GPOs are generally able to negotiate lower prices than the manufacturers' list prices.

6

Here, Novation, which is a GPO that represented Healthcare Providers, entered into an NDC with Becton for the sale and purchase of the hypodermic products. Although the NDC provided that Novation's members would have the option of purchasing hypodermic products pursuant to the NDC, the members were not obligated to make any purchases under the NDC. The NDC required that Becton make the hypodermic products "available for purchase by [Distributors] at the [a]ward [p]rices for resale to [Healthcare Providers]." (JA3926.) Under the NDC Distributors, on behalf of Healthcare Providers, were to submit orders for hypodermic products to Becton; Becton would then deliver those products to, and invoice, Distributors; and Distributors were responsible for paying Becton pursuant to the rates set forth in the NDC. Notably, the NDC did not specify any particular distributor or means of distribution, nor did it purport to set the final price at which Distributors would resell the hypodermic products to Healthcare Providers.

*Distribution Agreement*

After an NDC is executed, the GPO notifies its members of the agreement's terms and conditions. Members who wish to participate in the NDC must notify the manufacturer of their intentions.

The participating members then separately negotiate and execute Distribution Agreements with their respective distributors. The Distribution Agreement governs the terms and conditions of the distributor's transaction with the member hospital, and generally includes: the price the member will pay to the distributor for the products; any

7

service fees the distributor may charge the member; and any other terms related to the transaction.

Here, Novation informed its members of the NDC with Becton. Healthcare Providers executed letters of commitment with Becton, notifying Becton that it should charge their distributor the agreed upon NDC price for the hypodermic products.

Healthcare Providers also entered into Distribution Agreements with their respective distributors and notified Becton of their distribution relationships. For example, appellee MedStar Health ("MedStar"), a Healthcare Provider and named plaintiff, negotiated and entered into a Distribution Agreement with Cardinal Company ("Cardinal"), a distributor, for the sale and delivery of, *inter alia*, the hypodermic products. MedStar agreed to submit orders directly to Cardinal. Cardinal was responsible for obtaining the requested hypodermic products from Becton, delivering them to MedStar, and invoicing Medstar. MedStar agreed to pay Cardinal an amount equal to the price Cardinal paid to purchase the products from Becton plus a markup, line fee, or an activity fee on a per-purchase-order basis.

*Dealer Notification Agreement*

After the member identifies its distributor, the manufacturer generally enters into some type of agreement with the distributor governing the terms and conditions of their relationship.

Here, Becton entered into Dealer Notification Agreements with Distributors. These agreements referred to Distributors as Becton's "servicing agent[s]." (JA5626.)[5] Under the DNAs, the member hospitals may submit orders directly to Distributors, and Distributors are to regard these orders as purchase orders from Becton. The DNAs require Distributors to ship the products within 3-6 days and invoice the member hospitals on behalf of Becton.

The DNA also governs Becton's payment and rebate system. Becton's list prices for the hypodermic products — i.e., the prices Becton charges distributors in non-contract sales — is higher than the prices set forth in contract sales under an NDC. Becton is concerned that distributors will obtain products from Becton at the lower NDC price and resell those products in non-contract sales. To protect against such behavior, Becton invoices Distributors at the higher list price for all shipments it makes to them. Subsequently, if a Distributor provides proof that it delivered the products to a customer pursuant to an NDC, then Becton issues a rebate to that Distributor for the difference between the higher list price that was invoiced and the lower contract price set forth in the NDC.

Moreover, the DNA also governs the products' title. Pursuant to the DNA, title to the products transferred from Becton to Distributors upon their shipment to Distributors. However, once Distributors shipped the products to a customer in a contract sale, title

---

[5] Becton asserts that since 2006, its DNA no longer referred to distributors as its servicing agents.

reverted back to Becton and was then transferred to the end customer once the delivery was completed.[6]

*Operation of the Hypodermic Products' Supply Chain for Contract Sales*

The operation of the supply chain appears straightforward: (1) a Distributor orders a large volume of hypodermic products from Becton. These orders are for anticipated contract and non-contract sales (i.e., Distributors do not know at that time which products it orders from Becton will be part of a contract sale). Becton ships these products to and invoices the Distributor at the distributor list price, not the NDC price. The Distributor takes title to the products, warehouses them, insures them against loss, and pays Becton; (2) a Healthcare Provider submits a request to its Distributor to purchase certain hypodermic products; (3) the Distributor ships the products to — and invoices — the Healthcare Provider as set forth in their Distribution Agreement; (4) the Healthcare Provider pays the Distributor directly for the products and the markup/line-fee/activity-fee; and (5) the Distributor applies for a rebate from Becton within 45 days of the end of the month in which the Distributor's transaction with the Healthcare Provider occurred, and Becton pays the rebate to the Distributor.

2.     NON-CONTRACT SALES

Non-contract sales, which account for the remaining 26% of Becton's sales for hypodermic products, are those sales of the hypodermic products that were not made pursuant to an NDC. The District Court ruled that Distributors were the direct purchasers

---

[6] Becton asserts that since 2006, the DNAs no longer state that title reverts to Becton upon Distributors' shipment of the products to customers.

of Becton's hypodermic products that they resold pursuant to non-contract sales. Healthcare Providers have not appealed that determination, and thus, Distributors' non-contract sales are not at issue on appeal.

B.    PROCEDURAL BACKGROUND

In 2005, several of the Distributors filed class action complaints alleging that Becton — in violation of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) and Section 4 of the Clayton Act (15 U.S.C. § 15) — illegally acquired and maintained monopoly power over sales of the hypodermic products and charged Distributors unlawfully inflated prices. The Judicial Panel on Multidistrict Litigation (the "MDL Panel") consolidated these cases in the District of New Jersey.

In 2006, MedStar and several of the other Healthcare Providers filed class action complaints against Becton, alleging the same underlying conduct asserted in Distributors' complaints. The MDL Panel also consolidated these cases in the District of New Jersey.

On April 27, 2009, Distributors and Becton agreed upon a conditional settlement. Under the conditional settlement, Becton would make a $45 million cash payment to a proposed class of entities similarly situated to Distributors in exchange for dismissal of their complaints with prejudice and certain releases. The settlement was contingent upon the District Court determining that Distributors, not Healthcare Providers, had standing under the Clayton Act to pursue antitrust claims against Becton. In accordance with the conditional settlement agreement, Distributors filed motions seeking: (a) certification of

11

the proposed class[7] and preliminary approval of the proposed settlement; and (b) partial summary judgment on the issue of direct-purchaser standing. Becton also moved for preliminary approval of the proposed settlement. Healthcare Providers opposed the motions by Distributors and Becton and filed a cross motion for partial summary judgment on the issue of direct-purchaser standing.

On September 30, 2010, the District Court, focusing on the "economic substance" of the hypodermic products' supply chain, granted Healthcare Providers' motion for partial summary judgment on the issue of direct-purchaser standing (the "Order"), holding that Healthcare Providers, not Distributors, were the direct purchasers of Becton's hypodermic products.

On November 23, 2010, the District Court, pursuant to 28 U.S.C. § 1292, certified its Order for interlocutory appeal. On July 22, 2011, we granted Distributors' petition for permission to appeal under § 1292(b).

---

[7] Distributors defined the class as:

> All persons or entities (and assignees of claims from such persons and entities) who (1) purchased BD Hypodermic Products in the United States from BD at any time during the period of March 23, 2001 through April 27, 2009 (the "Class Period"), and (2) were invoiced by BD for said purchases (the "Direct Purchaser Class").
>
> The Direct Purchaser Class excludes BD, BD's parents, subsidiaries and affiliates, and United States Government Entities and those persons or entities who are permitted by the Court to opt out of the Direct Purchaser Class.

12

II.    ANALYSIS[8]

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a).  The Supreme Court has limited the scope of § 4 through the direct-purchaser rule, which states that only the immediate buyer of a product has standing to maintain a federal antitrust action.  *See, e.g.*, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 206-09 (1990) (holding that only the direct purchaser has standing to bring federal antitrust claims even where the direct purchaser may pass the entire unlawful overcharge to downstream purchasers); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-29 (1977) (holding that an indirect purchaser lacked standing to pursue federal antitrust claims); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489-91 (1968) (rejecting the alleged antitrust violator's argument that the direct purchasers of its goods lacked standing to pursue federal antitrust claims because those purchasers passed on the alleged overcharges to downstream

---

[8] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1337.  We have jurisdiction under 28 U.S.C. § 1292(b).

We review the District Court's disposition of a summary judgment motion *de novo*, applying the same standard as the District Court.  *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008) (citing *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All inferences must be viewed in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The issue of antitrust standing is a legal issue, over which we exercise plenary review."  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 83 (3d Cir. 2011) (citing *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 847 (3d Cir. 1996)).

customers); *see also McCarthy v. Recordex Serv.*, 80 F.3d 842, 848 (3d Cir. 1996) (interpreting *UtiliCorp*, *Illinois Brick*, and *Hanover Shoe* as "enunciating a bright-line rule that only a purchaser immediately downstream from the alleged monopolist may bring an antitrust action").

Our recent decision in *Warren General Hospital v. Amgen Inc.*, 643 F.3d 77 (3d Cir. 2011), issued after the decision we now review, is particularly instructive. There, a hospital plaintiff sued a pharmaceutical manufacturer, asserting an illegal tying claim under federal antitrust laws. *Id.* at 80. The hospital purchased the products at issue through contract sales, which involved a GPO-negotiated contract structuring the supply chain so that the manufacturer would sell the products to wholesalers, who in turn would resell those products to the member hospitals. *Id.* at 83. The district court ruled that the hospital was an indirect purchaser and dismissed the complaint. *Id.* at 79.

In affirming the district court's decision, we focused on the "mechanics of the transactions" between the hospital, the wholesaler, and the manufacturer. *Id.* at 79, 88. In particular, we noted that: (1) when the hospital wants to purchase the products at issue, it places an order through the wholesaler; (2) the wholesaler negotiates the final sales price of the products separately with the hospital; (3) the hospital physically takes delivery of the shipment from the wholesaler; and (4) the hospital pays the wholesaler directly and does not transmit funds to the manufacturer. *Id.* at 88. Thus, we determined that the hospital's purchases "go through at least one other stage in the chain of distribution" before reaching the hospital, and that the hospital was an indirect purchaser that lacked standing. *Id.*

14

Here, the mechanics of the distribution chain for Becton's hypodermic products are essentially identical to those that were at issue in *Warren General*. Most notably: (1) when Healthcare Providers needed hypodermic products, they placed orders through Distributors; (2) Distributors negotiated the final sales price of the hypodermic products separately with the Healthcare Providers; (3) Distributors physically shipped the products to Healthcare Providers; and (4) Healthcare Providers paid Distributors directly and did not transmit funds to Becton. Thus, because the hypodermic products pass through at least one other stage in the chain of distribution before reaching Healthcare Providers, the Distributors, not Healthcare Providers, are the direct purchasers in contract sales.[9] *See, e.g.*, *Warren General*, 643 F.3d at 88.[10]

---

[9] We are not persuaded by Healthcare Providers' attempt to distinguish *Warren General*. Healthcare Providers argue that, unlike the wholesalers in *Warren General*, Distributors were acting as Becton's servicing agents for the contract sales, and thus, the hypodermic product supply chain had only one transaction between Becton/Distributors on one hand and Healthcare Providers on the other. Even assuming, without deciding, that Healthcare Providers are correct both that Distributors were acting as the servicing agents for Becton in contract sales and that servicing agents cannot be direct purchasers as a matter of law, the Healthcare Providers are still indirect purchasers because the products had already passed through at least one other stage in the chain of distribution before Distributors acted as Becton's servicing agents. As discussed *supra*, at the time that Distributors receive the hypodermic products from Becton, title to those products and the associated risks of ownership and loss transfer to Distributors, who warehouse these fungible products in their inventory without knowing whether any will be the subject of a contract sale. Becton invoices Distributors for all of these hypodermic products at the higher list price. Thus, the hypodermic products already passed through a stage in the chain of distribution before they could be the subject of any contract sale in which Distributors allegedly act as Becton's servicing agents.

[10] We recognize that the District Court, which issued its Order prior to our decision in *Warren General*, did not have the benefit of our position on this issue.

Accordingly, we will reverse.[11]

[11] On October 17, 2011, Distributors and Becton filed a joint motion to seal their appellate briefs and Volumes 1 and 3-12 of the Joint Appendix (the "First Sealing Motion"). Distributors and Becton reasoned that these materials included documents or references to documents that were filed under seal with the District Court pursuant to a protective order. Healthcare Providers opposed the First Sealing Motion to the extent that it sought to seal publicly-available documents. On October 31, 2011, after consulting with the Clerk's Office, Distributors and Becton filed another joint motion requesting leave to strike portions of the Joint Appendix and to file a supplemental redacted appendix containing the unsealed documents (the "Second Sealing Motion"). Healthcare Providers have not opposed the Second Sealing Motion except to the extent that it seals the District Court's Order and Decision underlying this appeal, which was sealed by the District Court. On December 5, 2011, Healthcare Providers filed a motion to seal their reply brief for the instant appeal (the "Third Sealing Motion") because it references matters that were filed under seal before the District Court. We will deny the First Sealing Motion and grant both the Second and Third Sealing Motions. Because these motions did not specify a desired duration for the sealing order, we will direct the Clerk's Office to seal the materials subject to the aforementioned motions for five years from the conclusion of the case, after which the materials shall be unsealed without notice to the parties. *See* Local App. R. 106.1(c)(2).