

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-1996

# McCarthy v. Recordex Svcs. Inc

Precedential or Non-Precedential:

Docket 95-1005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"McCarthy v. Recordex Svcs. Inc" (1996). *1996 Decisions*. Paper 191.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/191

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

----------

No. 95-1005

----------

MARY RUTH MCCARTHY; GUY COLVILLE; EDWARD ORMSBY;
CARMEN TOMASETTI; JOSEPH HOFFMAN,

Appellants

v.

RECORDEX SERVICE, INC.; COPYRIGHT, INC.; SMART CORP., National
Headquarters Medical Records Copying; MEDFAX INCORPORATED;
HOSPITAL CORRESPONDENCE COPIERS; MERCY HEALTH CORPORATION OF
SOUTHEASTERN PENNSYLVANIA, Misericordia Hospital Division;
METHODIST HOSPITAL; THE GRADUATE HOSPITAL; HAHNEMANN
UNIVERSITY HOSPITAL; THE LOWER BUCKS HOSPITAL

----------

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 93-cv-00281)

----------

Argued Monday, January 22, 1996

BEFORE:  STAPLETON, COWEN and GARTH, <u>Circuit</u> <u>Judges</u>

----------

(Opinion filed April 4, 1996)

----------

Stephen R. Bolden (Argued)
Richard C. Ferroni
Fell & Spalding
100 South Broad Street
2230 Land Title Building
Philadelphia, PA 19110

_____     <u>Attorneys for Appellants</u>

Leslie M. Gerstein
Law Offices of Nancy D. Wasser
One Penn Center at Suburban Station
1617 J.F.K. Boulevard
Suite 1100
Philadelphia, PA 19103-1811

Attorney for Appellees
Recordex Services, Inc.,
Copyright, Inc. and Medfax, Inc.

David H. Marion
David Zalesne
Montgomery, McCracken, Walker & Rhoads
Three Parkway, 20th Floor
Philadelphia, PA 19102

Attorneys for Appellee Smart Corporation

Christopher W. Mattson
Katherine B. Kravitz
Barley, Snyder, Senft & Cohen
126 East King Street
Lancaster, PA 17602

Attorneys for Appellee Hospital
Correspondence Copiers, Inc.

Alan M. Lieberman
Schnader, Harrison, Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

Attorney for Appellee Mercy Health
Corporation of Southeastern                    Pennsylvania,
Misericordia Hospital                      Division

Edward C. Mengel, Jr.
White & Williams
One Liberty Place
1650 Market Street
Suite 1800
Philadelphia, PA 19103

Attorneys for Appellee Methodist
Hospital

3

Anthony E. Creato
Mesirov, Gelman, Jaffe, Cramer
   & Jamieson
1735 Market Street
37th Floor
Philadelphia, PA 19103-7598

Attorney for Appellee The Graduate
Hospital

Michael T. Scott (Argued)
Martin H. Karo
Reed, Smith, Shaw & McClay
1650 Market Street
2500 One Liberty Place
Philadelphia, PA 19103-7301

Attorneys for Appellee
Hahnemann University Hospital

Jonathan B. Sprague
Kathleen Chancler
Post & Schell
1800 JFK Boulevard
19th Floor
Philadelphia, PA 19103

Attorneys for Appellee
The Lower Bucks Hospital

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

The instant appeal requires us to decide whether the plaintiff-clients, w

attorneys purchased photocopies of the clients' hospital records for the purpose of

prosecuting their clients' personal injury and medical malpractice claims, have sta

to bring an antitrust action against the sellers of the photocopies.  We hold that

clients lack standing to bring a treble-damages claim because they are not "direct

purchasers," as required by Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  Ho

4

we also hold that these clients are not barred from seeking injunctive relief under

section 16 of the Clayton Act.


I.

Plaintiffs Mary Ruth McCarthy,[0] Guy Colville, Edward Ormsby, Carmen Tomasetti[0]

Joseph Hoffman filed a three-count complaint, on January 19, 1993, against five hos

(the "Hospital defendants")[0] and five copy-service companies (the "Copy Service

defendants").[0]  The complaint asserted violations of the Sherman Antitrust Act, 15

§§ 1 and 2 (count I);[0] violations of the Racketeering, Influence, and Corrupt Organ

tions Act (RICO), 18 U.S.C. §§ 1433 and 1962 (count II); and violations of the civi

rights laws, 42 U.S.C. § 1983 (count III).  The complaint and amended complaint sou

injunctive relief, money damages, class certification and attorneys' fees. In esse

plaintiffs allege that the Hospital Defendants and the Copy Service Defendants cons

---

[0]McCarthy died subsequent to the institution of this litigation.  A personal
representative has been named for her but has not been formally substituted on the
as of the date of this appeal.
[0]Tomasetti died after commencing this action.  No personal representative has been
as of the date of this appeal.
[0]The Hospital Defendants are Mercy Health Corporation of Southeastern Pennsylvania,
Misericordia Hospital Division ("Misericordia"); Methodist Hospital ("Methodist");
Graduate Hospital ("Graduate"); Hahnemann University Hospital ("Hahnemann"); and th
Bucks Hospital ("Lower Bucks"). They are all hospital corporations that operate hos
in the Commonwealth of Pennsylvania.
[0]The Copy Service Defendants are Recordex Services, Inc. ("Recordex"), CopyRight, I
("CopyRight"), Smart Corporation ("Smart"), Medfax, Inc. ("MedFax"), and Hospital
Correspondence, Copiers ("HCC").  They are all corporations doing business in the
Commonwealth of Pennsylvania, who have entered into contracts with one of the Hospi
Defendants to perform copying services in response to requests for copies of hospit
records.
[0]Count I specifically alleges that the defendants engaged in a "contract combinatio
conspiracy in restraint of trade effecting [sic] interstate commerce"; and that "th
defendants possess a monopoly in the relevant market for the performance of copying
services of hospital patient records, and have willfully maintained that power in o
illegally extract unlawful prices for the performance of said copy services."  Comp
at ¶ 52.

5

to charge excessive prices for photocopies of medical records requested by patients former patients.

Each of the named plaintiffs, at some time within four years before filing the instant action, were patients at hospitals owned by the Hospital Defendants. Each plaintiff had retained either Matty & Ferroni ("M&F"), a New Jersey law firm, or Fe Spalding ("F&S), a Philadelphia firm, to file a personal injury or medical malpract claim on his or her behalf. In each case, after the particular plaintiff had signe medical consent form authorizing the appropriate hospital to release his or her med records, the plaintiff's attorney requested photocopies of the client's hospital re The copy service company, in each case, billed the attorney directly.[0]

Each of the five plaintiffs had entered into a contingent-fee agreement with e M&F or F&S. With the exception of McCarthy, none of the plaintiffs were obligated the relevant retainer agreement to reimburse the law firm for costs, including the photocopying expenses at issue, unless a monetary recovery in favor of the particul client was obtained.[0] McCarthy's agreement with F&S, on the other hand, provided th

---

[0]Tomasetti retained M&F, which requested copies of patient records from Hahnemann; Recordex provided the photocopying services and charged M&F $44.40. Hoffman retain which requested copies of records from Lower Bucks; MedFax performed the photocopyi charged M&F $19.22. Both Tomasetti and Hoffman settled their cases and reimbursed of their settlement proceeds for the photocopying costs.

Colville retained M&F, which requested copies from Methodist; Smart, which per the photocopying, charged M&F $25.49. Ormsby also retained M&F, which requested co from Graduate; HCC photocopied the records, charging M&F $38.40. At the time this was filed, neither Colville nor Ormsby had reached a settlement, and neither had reimbursed M&F for the copying expenses incurred. Ormsby has apparently discontinu personal injury claim. App. at 536.

McCarthy retained F&S, which requested copies of her medical records from Misericordia. CopyRight, which was responsible for providing copying services rela requests for Misericordia patient records, billed F&S $540. F&S refused to pay the but eventually obtained the copies from opposing counsel. App. at 517-20, 525.
[0]The four plaintiffs other than McCarthy entered into contingent fee agreements wit Under these agreements, the law firm would receive its fee (33-1/3% for Tomasetti a for each of the other three plaintiffs) only if it successfully litigated or settle case. Under Colville's contract, M&F would be entitled to 40% of the recovery plus reimbursement of any costs. The other three contracts only awarded M&F a percentag

6

"[t]he absence of a recovery shall not relieve [McCarthy] from the obligation of pa

court costs and other proper litigation and investigative costs."[0]  App. 498.  Howe

Stephen R. Bolden, a partner at F&S, admitted in an affidavit that despite the cont

language, in actual practice, the firm never sought reimbursement for advanced cost

representation of the client did not lead to a recovery:

> Although under the express language in this Contingent Fee Agreement, Fell &
> Spalding is contractually entitled to seek reimbursement from a client even
> where a representation of that client has not led to the recovery of funds; as
> matter of actual practice, where Fell & Spalding has been unsuccessful in
> obtaining a recovery of funds by way of settlement or otherwise . . . Fell &
> Spalding has not sought reimbursement for the costs incurred in copying a
> client's hospital records . . . .

App. 526.[0]

Each of the Hospital Defendants had entered into a contract with one of the Co

Service Defendants, granting the Copy Service Defendant the exclusive right to phot

hospital records requested by patients or other members of the public entitled to s

records.  Under the contract, the copy-service company agreed to photocopy any medi

---

the recovery (i.e. M&F would have to cover its costs out of its percentage share of
settlement or award).

    None of the fee agreements entitled M&F to reimbursement of costs if the clie
failed to recover.  Colville's contract provided:  "If there is no recovery there w
no charge for services rendered."  App. 414.  Likewise, Hoffman's agreement stated:
no monies are recovered there will be no fee for services rendered."  App. 433.  Or
agreement similarly read:  "If there is no recovery, there are no charges for any f
App. 455.  Finally, Tomasetti's contingent fee agreement provided:  "If no monies a
recovered attorney to have no claim for services rendered. -- Attorney to advance a
costs necessary, & to be reimbursed at settlement."  App. 470.
[0]If McCarthy prevailed, F&S would receive a 1/3 contingent fee (calculated based on
amount of the award or settlement before deducting expenses) plus litigation expens
[0]Richard C. Ferroni, a partner at M&F, similarly stated in an affidavit that

> [h]e had not, nor has his firm, ever sought reimbursement for costs (including
> costs of obtaining copies of a client's hospital records) from a client where
> there has not been a recovery in the action in which he or his firm has
> represented the client and the Contingent Fee Agreement does not address costs
> although clients are advised they are responsible for costs regardless of
> outcome.

App. 536.

7

records requested by patients or other requestors. The sole remuneration received

Copy Service Defendants derived from the copying charges paid by the requestors. A

685, 692, 694, 698, 701.

Patients or their attorneys were charged $1 per page for copies of medical rec

In addition, they also typically paid a retrieval fee, which was remitted to the ho

an "administrative" or "basic" fee (i.e. a flat fee unrelated to the number of copi

which was retained by the copy-service company; and postage and handling fees.

Certain "favored" requestors were charged a reduced rate[0] or no fee at all.[0] T

Hospital Defendants set the schedule of charges, designating the requestors who wou

would not be charged. Typically, sixty percent or more of the requests for hospita

records were nonbillable.

Plaintiffs claim that the practice of subsidizing certain requestors while cha

patients or their agents an inflated fee violated a Pennsylvania regulation, which

provides in relevant part:

> Patients or patient designees shall be given access to or a copy of their
> medical records, or both . . . . Upon the death of a patient, the hospital sha
> provide, upon request, to the executor of the decedent's estate or, in the
> absence of an executor, the next of kin responsible for the disposition of the
> remains, access to all medical records of the deceased patient. The patient o
> the patient's next of kin may be charged for the cost of reproducing the copie
> however, the charges shall be reasonably related to the cost of making the cop

28 Pa. Code § 115.29 (emphasis added).

After plaintiffs filed an amended complaint, the defendants moved to dismiss p

to Federal Rule of Civil Procedure 12(b)(6). The district court, by order dated Au

1993, denied defendants' motion to dismiss counts I (antitrust) and II (RICO) but g

the motion to dismiss count III (civil rights).

---

[0]For example, Medicare copy requests were billed at seven cents per page; and the
Workmen's Compensation Appeal Board paid a ten dollar flat fee per request regardle
the number of pages actually copied.

[0]For example, other hospitals, physician's offices, Blue Cross and Blue Shield, the
Veteran's Administration and social service agencies received copies for free. The
military and certain HMOs also received free copies.

Subsequently, on April 4, 1994, plaintiffs moved to certify the case as a clas

action.  On November 18, 1994, in a Memorandum and Order, the district court denie

plaintiffs' motion for class certification.

On April 1, 1994, defendant Hahnemann filed a motion for partial summary judgm

count I (the antitrust claim), which was eventually joined by all of the defendants

Smart.  The district court denied the motion for partial summary judgment in an ord

dated May 5, 1994.

Subsequently, Hahnemann moved for reconsideration.  On July 8, 1994, the distr

court granted Hahnemann's motion for reconsideration and granted summary judgment o

I in favor of all defendants, holding that the plaintiffs lacked standing because t

were not "direct purchasers" of the hospital records, within the meaning of <u>Illinoi</u>

<u>Co. v. Illinois</u>, 431 U.S. 720 (1977).

On December 12, 1994, all of the defendants joined in a motion for summary jud

on the remaining RICO claim, on the theory that antitrust standing principles appli

equally in the RICO context.  On December 29, 1994, the district court granted summ

judgment to all defendants on count II, thus disposing of all three counts of the

complaint.  Plaintiffs timely filed the instant appeal.

II.

The district court had jurisdiction over plaintiffs' antitrust and RICO claims

15 U.S.C. § 15; 18 U.S.C. § 1964; and 28 U.S.C. § 1331.  We have appellate jurisdic

over the district court's grant of summary judgment in favor of defendants under 28

§ 1291.

The issue of antitrust standing is a legal issue, over which we exercise plena

review.  <u>In re Lower Lake Erie Iron Ore Antitrust Litig.</u>, 998 F.2d 1144, 1164 (3d C

1993), <u>cert. dismissed</u>, 114 S. Ct. 625, 652, <u>and cert. denied</u>, 114 S. Ct. 921 (1994

also exercise plenary review of a district court's grant of summary judgment, apply

9

same standards applied by the district court.  <u>Rosen v. Bezner</u>, 996 F.2d 1527, 1530

Cir. 1993); <u>Koshatka v. Philadelphia Newspapers, Inc.</u>, 762 F.2d 329, 333 (3d Cir. 1

Summary judgment is proper only where "there is no genuine issue as to any mat

fact and . . . the moving party is entitled to judgment as a matter of law."  Fed.

P. 56(c). The moving party bears the burden of proving that no genuine dispute exis

to any material fact.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Moreover, any inferences to be drawn must be viewed in the light most favorable to

party opposing summary judgment.  <u>Id.</u> at 247; <u>Matsushita Elec. Indus. Co. v. Zenith</u>

<u>Corp.</u>, 475 U.S. 574, 587 (1986).


### III.

### A.

Almost twenty years ago, the Supreme Court articulated the so-called "direct

purchaser" rule, an antitrust standing doctrine that barred downstream indirect pur

from bringing an antitrust claim.  <u>See</u> <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720

(1977).  Recognizing that allowing an indirect purchaser to assert an antitrust cla

the portion of an overcharge "passed on" to the indirect purchaser would create an

intractable problem of tracing and apportioning damages between different purchaser

the chain of distribution, the Court chose to avoid this morass by enunciating a br

line rule that only the purchaser immediately downstream from the alleged monopolis

bring an antitrust action.  <u>Id.</u>

Almost a decade before <u>Illinois Brick</u>, the Supreme Court laid the foundation f

"direct purchaser" standing requirement in <u>Hanover Shoe, Inc. v. United Shoe Machir</u>

<u>Corp.</u>, 392 U.S. 481 (1968), which rejected a "pass-on" defense proffered by an anti

defendant who claimed that the plaintiff was not entitled to treble damages for cos

"passed on" to its customers.  <u>Id.</u> at 487-89.  In <u>Hanover Shoe</u>, the plaintiff shoe

manufacturer, Hanover Shoe, Inc., brought suit under section 4 of the Clayton Act a

10

United Shoe Machinery Corp. (USMC), a manufacturer and distributor of shoe machiner[y], alleging that USMC had monopolized the shoe machinery industry by refusing to sell equipment and requiring users to lease the equipment instead. Id. at 486-87. USMC that Hanover Shoe had been able to recoup its losses by charging its customers more the shoes and thus did not suffer any cognizable injury because it had passed on th allegedly illegal overcharge to its customers. Id. at 487-88.

The Court rejected USMC's pass-on theory, explaining that entertaining such a would raise difficult proof issues as to the amount of the overcharge passed on and whether, absent the overcharge, Hanover Shoe could have raised its prices. Id. at The Court also expressed concern that downstream buyers would have only "a tiny sta lawsuit" and thus little incentive to prosecute a private antitrust claim. Id. at The Court reasoned that allowing a pass-on defense would diminish private antitrust enforcement and thereby increase the likelihood that violators of antitrust laws wo escape liability. Id.

In Illinois Brick, the Supreme Court addressed the corollary to the problem th faced in Hanover Shoe: offensive use of the pass-on theory by indirect purchasers recover treble damages for injuries "passed on" to them by intermediaries in the distribution chain. Illinois Brick involved a suit brought by the State of Illinoi 700 local governmental entities against a group of concrete block manufacturers, wh allegedly engaged in a price-fixing conspiracy. 431 U.S. at 726-27. The State and local municipalities had hired general contractors for several large construction p in the Chicago area. Id. at 726. The general contractors, in turn, had subcontrac masonry work to certain masonry contractors who had purchased the allegedly overpri blocks from the conspirators. Id. The State of Illinois and the local government entities were thus indirect purchasers of concrete block, two levels down the distr chain from the manufacturers. Id.

11

Illinois and the other governmental entities claimed that part or all of the overcharge had been passed on by the subcontractors and general contractors.  Id. a As a result, according to the plaintiffs, they had overpaid for the concrete block than three million dollars.  Id.  The Court dismissed the claim, holding that indir purchasers may not sue for antitrust damages. Id. at 736.

The Court in Illinois Brick explained that the outcome was dictated by Hanover and that principles of judicial consistency compelled the Court to prohibit the off use of a pass-on theory where it had disallowed the defensive use of the pass-on do in a similar factual situation.  Id. at 730. The Court further explicated that perm the latter while disallowing the former would create a risk of multiple liability: one-sided application of Hanover Shoe substantially increases the possibility of inconsistent adjudications--and therefore of unwarranted multiple liability for the defendant--by presuming that one plaintiff (the direct purchaser) is entitled to fu recovery while preventing the defendant from using that presumption against the oth plaintiff . . . ."  Id.

The State posited that the danger of duplicative recovery could be avoided by apportioning the damages attributable to the concrete-block manufacturers' wrongful conduct.  The Court, however, rejected the State's argument that indirect purchaser should be allowed to recover the fraction of the overcharge "passed on" to them, explaining:

> Permitting the use of pass-on theories . . . essentially would transform treble-damages actions into massive efforts to apportion the recovery among al potential plaintiffs that would have absorbed part of the overcharge--from direct purchasers to middlemen to ultimate consumers.  However appealing this attempt to allocate the overcharge might seem in theory, it would add whole ne dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

Id. at 737.

12

Subsequently, in <u>Kansas v. Utilicorp United, Inc.</u>, 497 U.S. 199 (1990), the Co

reaffirmed its commitment to the "direct purchaser" rule, refusing to carve out an

exception to <u>Illinois Brick</u> for situations where the full cost of the product (and

one hundred percent of any overcharge) had been passed on to the indirect purchaser

at 216.   In <u>Utilicorp</u>, the States of Kansas and Missouri, acting as <u>parens patriae</u>,

brought an antitrust action on behalf of their residents, claiming that a pipeline

and five gas producers had conspired to inflate the price of the natural gas that t

supplied to public utilities.  <u>Id.</u> at 204.   These utilities, according the States,

passed on the full amount of the overcharge to their residential and commercial cus

<u>Id.</u>

Kansas and Missouri argued that the concerns voiced in <u>Illinois Brick</u>, namely

difficulties of apportionment, the risk of multiple recovery and the diminution of

incentives for private antitrust enforcement, were absent because regulated public

utilities pass on one hundred percent of their costs to consumers, who are the ones

actually suffer antitrust injury.   The Court forcefully rejected that argument, opi

that "[a]lthough the rationales of <u>Hanover Shoe</u> and <u>Illinois Brick</u> may not apply wi

equal force in all instances, we find it inconsistent with precedent and imprudent

event to create an exception for regulated public utilities."  <u>Id.</u> at 208.

We have applied <u>Illinois Brick</u>'s antitrust standing principle on several occas

For example, in <u>Mid-West Paper Products Co. v. Continental Group, Inc.</u>, 596 F.2d 57

Cir. 1979), we relied on <u>Illinois Brick</u> in holding that indirect purchasers of cons

bags could not maintain a treble-damages suit against the manufacturers of such bag

at 575.   In <u>Mid-West Paper</u>, the defendants manufactured so-called consumer bags--si

multilayered paper bags used for packaging pet foods, coffee, cookies, chemicals an

like.  <u>Id.</u>   The plaintiff-grocery stores purchased either empty consumer bags (whic

used to package their own products) from middlemen and wholesalers or products that

pre-packaged in consumer bags for resale to their customers. <u>Id.</u> at 575-76.  After

13

reviewing the teachings of <u>Illinois Brick</u>, we determined that the "direct purchaser

barred the treble-damages claims of all of the plaintiffs (except Mid-West Paper Pr

Company, which had purchased consumer bags directly from a subsidiary of one of the

defendants). <u>Id.</u> at 575.

Similarly, in <u>Merican, Inc. v. Caterpillar Tractor Co.</u>, 713 F.2d 958 (3d Cir.

<u>cert. denied</u>, 465 U.S. 1024 (1984), non-factory-authorized dealers, who had purchas

electrical generators from authorized dealers for resale in foreign markets, allege

Caterpillar, the manufacturer of these electrical generators, had illegally imposed

penalty on its dealers to prevent or discourage the dealers from selling Caterpilla

products to independent marketers. <u>Id.</u> at 960. The district court held that the

plaintiffs had standing under <u>Illinois Brick</u> because the nonfactory-authorized deal

were the "direct target[s] of an unlawful conspiracy." <u>Id.</u> at 962. We reversed, h

that an indirect purchaser, even if a "direct target" of an antitrust conspiracy, l

standing under <u>Illinois Brick</u>. <u>Id.</u> at 966.

Likewise, in <u>Link v. Mercedes-Benz, Inc.</u>, 788 F.2d 918 (3d Cir. 1986), Mercede

repair customers claimed that Mercedes dealers, who were required to purchase parts

exclusively from Mercedes at artificially inflated prices, had passed on those cost

retail customers. <u>Id.</u> at 928-30. Citing <u>Illinois Brick</u>, we held that retail custo

were indirect purchasers and therefore lacked antitrust standing. <u>Id.</u> at 930.

Most recently, in <u>Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp</u>

F.2d 425 (3d Cir. 1993), we held that only the direct purchaser of an aircraft, and

downstream buyer or assignee, had standing to pursue an antitrust claim. <u>Id.</u> at 43

emphasized that "any exception to the direct purchaser rule would be inappropriate

case for the same reasons that the Supreme Court held an exception would be inappro

in <u>Utilicorp</u>." <u>Id.</u>

B.

14

Plaintiffs argue that the Supreme Court has receded from <u>Illinois Brick</u>'s "dir[...]

purchaser" rule.  Specifically, plaintiffs contend that the "direct purchaser" requ[...]

has been displaced by the multi-factor approach to antitrust standing outlined in [...]

<u>Associated General Contractors v. California State Council of Carpenters</u>, 459 U.S. [...]

(1983) [hereinafter "<u>AGC</u>"].

In <u>AGC</u>, the plaintiff-unions, representing California construction workers, su[...]

association of employers with whom the unions had entered into collective bargainin[...]

agreements. <u>Id.</u> at 522-24.  The complaint alleged that the association and its memb[...]

coerced certain landowners and other contractors to hire non-union labor.  <u>Id.</u>

In determining whether the plaintiff-unions had standing to sue under section [...]

the Clayton Act, the <u>AGC</u> Court employed a five-part analytical framework, which

encompassed the following considerations:  (1) the causal connection between the an[...]

violation and the harm to the plaintiff (including whether the defendant intended t[...]

that harm), <u>id.</u> at 537; (2) whether the "nature" of the plaintiff's alleged injury [...]

the type that the antitrust laws were intended to forestall," <u>id.</u> at 538; (3) the

directness or indirectness of the asserted injury, <u>id.</u> at 541; (4) the existence of [...]

direct victims of the alleged injury (i.e. whether the plaintiff is the party most [...]

to seek redress of the antitrust violation), <u>id.</u> at 542; and (5) the potential for [...]

duplicative recovery or complex apportionment of damages, <u>id.</u> at 543-44.  The <u>AGC</u> f[...]

factor framework was an attempt by the Court to synthesize and clarify the confusin[...]

collection of the then-extant antitrust-standing rules.[0]

---

[0]Prior to <u>AGC</u>, the courts of appeals applied a variety of different tests to determ[...]
standing under section 4 of the Clayton Act:  (1) the "direct injury" test, <u>see</u> Chr[...]
<u>Corp. v. Fedders Corp.</u>, 643 F.2d 1229, 1233 (6th Cir.), <u>cert. denied</u>, 454 U.S. 893 [...]
<u>Loeb v. Eastman Kodak</u>, 183 F. 704, 709 (3d Cir. 1910); (2) the "zone of interests" [...]
<u>see</u> <u>Malamud v. Sinclair Oil Corp.</u>, 521 F.2d 1142, 1151-1152 (6th Cir. 1975); and (3[...]
"target area" test, <u>see</u> <u>Pan-Islamic Trade Corp. v. Exxon Corp.</u>, 632 F.2d 539, 546-4[...]
Cir. 1980), <u>cert. denied</u>, 454 U.S. 927 (1981); <u>Calderone Enters. Corp. v. United A</u>[...]
<u>Theatre Circuit, Inc.</u>, 454 F.2d 1292, 1295 (2d Cir. 1971), <u>cert. denied</u>, 406 U.S. 9[...]
(1972).  Recognizing that these alternative formulations for assessing antitrust st[...]
often led to contradictory and inconsistent results, the Supreme Court in <u>AGC</u> attem[...]

Contrary to plaintiffs' intimation, however, the AGC Court neither overruled [Illinois]

Brick nor limited its application. Indeed, the AGC Court cited Illinois Brick with

approval.  See id. at 544-45.  Moreover, factors four and five in the AGC framework

Illinois Brick's concerns.  In our view, AGC incorporates, rather than repudiates,

principles of Illinois Brick.[◊]

Plaintiffs assert, however, that the absolute bar of the "direct purchaser" ru[le]

been supplanted by AGC's balancing approach.  In support of this contention, plaint[iffs]

cite to certain passages from our opinion in In re Lower Lake Erie Iron Ore Antitru[st]

Litigation, 998 F.2d 1144 (3d Cir. 1993), cert. dismissed, 114 S. Ct. 625, 652, an[d cert.]

denied, 114 S. Ct. 921 (1994), wherein we adumbrated that "indirect purchaser statu[s is]

[not necessarily] the death knell of [an antitrust] claim . . . ."  Id. at 1168.  I[n Lower]

Lake Erie, several steel companies, dock companies and trucking companies filed civ[il]

actions in federal district court, alleging that the defendant railroad companies s[erving]

the lower Lake Erie industrial region had conspired to monopolize the transportatio[n and]

handling of iron ore in the region.  Id. at 1151, 1152.

---

articulate a unified set of factors that could be applied generally in determining
antitrust standing.

[◊]Of course, AGC and Illinois Brick address two analytically distinct aspects of ant[itrust]
standing.  See Merican, 713 F.2d at 963-65 (noting that "the Supreme Court has reco[gnized]
two types of limitations on the availability of the section 4 remedy which the cour[t must]
consider when examining whether a treble damage action may be maintained").  The AG[C Court]
was concerned primarily with the issue of whether a particular plaintiff's injury w[as too]
remote from an antitrust injury to warrant providing that plaintiff a section 4 rem[edy.]
Id. at 964.  This inquiry, akin to the determination of "proximate cause" in the
negligence context, is subtle and resists the use of hard-and-fast "black letter" r[ules.]
See id.

In contrast, Illinois Brick dealt with the issue of whether a plaintiff who is [able]
to trace an injury to an antitrust violation falls "within the group of 'private at[torneys]
general' that Congress created to enforce the antitrust laws under section 4."  Id. [at]
963.  Illinois Brick focuses exclusively on the risk of duplicative recovery and th[e]
potential for overly-complex damages and apportionment calculations.  Id. at 963-64[.]
Because there would always be a risk of duplicative recovery, as well as the potent[ial for]
complex apportionment computations, if indirect purchasers were allowed to bring an[titrust]
claims, the "direct purchaser" rule, unlike the AGC standard, is a bright-line rule[.]

16

In a bifurcated trial, the liability jury found against Bessemer and Lake Erie

Railroad Company (BL&E), the sole remaining defendant,[0] and in favor of all plainti

one; and the damages jury awarded all but one claim for damages. Id. at 1151. On

we applied AGC and affirmed the district court's denial of BL&E's motion to dismiss

lack of standing and the district court's denial of BL&E's motion for judgment n.o.

Plaintiffs here contend that Lower Lake Erie requires that we set aside the di

court's grant of summary judgment and remand for a determination of standing pursua

the AGC factors. We disagree.

Lower Lake Erie is fully distinguishable. In Lower Lake Erie, we found that t

plaintiffs' claims did not involve "the particular kind of double recovery Illinois

sought to prevent." Id. at 1169.

By contrast, all of the policy concerns expressed in Illinois Brick are implic

the present case. First, there is considerable risk that the Hospital defendants a

Service defendants would be exposed to multiple liability. Although plaintiffs' att

here have chosen not to sue the defendants directly, it is probable that lawyers wh

themselves purchase photocopies of their clients' hospital records would bring trek

damage claims against the Hospital defendants and the Copy Service defendants in th

future. Indeed, both the district court and this court inquired as to why the inst

complaint had not been amended to substitute the attorneys as plaintiffs. No satis

answer was given. Hence, if we were to deny the defendants the protection of the "

purchaser" rule, they could potentially be held liable to both the clients and the

attorneys representing the clients.

Furthermore, this lawsuit involves apportionment problems perhaps more complex

those implicated in Illinois Brick. Because the costs of the photocopies are only p

on to the client, if the costs are passed on at all, on a contingent basis, the dis

---

[0]The other defendants all settled before trial.

17

court would be faced with complex statistical calculations as to the percentage of

photocopying costs borne by the attorneys as compared to the costs borne by their c

In addition, the district court would have to ascertain the degree to which conting

fees charged to successful plaintiffs includes a recoupment of photocopying costs r

charged to losing plaintiffs.

Under these circumstances, plaintiffs cannot escape the absolute bar of the "c

purchaser" rule.  In order to survive summary judgment, plaintiffs must establish t

clients, and not their attorneys, are the direct purchasers of the hospital-record

photocopies.  On this record, no such proof exists.


C.


Plaintiffs argue that they, and not their lawyers, are the direct purchasers c

hospital record photocopies.[0] Plaintiffs contend that their attorneys merely acted

their agents in purchasing the photocopies.  Citing In re Toilet Seat Antitrust

Litigation, 1977-2 Trade Cases ¶ 61,601 (E.D. Mich. 1977), plaintiffs posit that pu

made by an agent on behalf of the agent's principal do not come within the scope of

"direct purchaser" rule.

---

[0]Plaintiffs first contend that their attorneys cannot be considered part of the cha
distribution because they do not make a profit from, or charge separately for, the
photocopies. We are not persuaded for at least two reasons.  First, in order for a
consumer to be considered an indirect purchaser of an item, it is not necessary tha
consumer incur a separate charge for that item; it is only necessary that the consu
have purchased the item through a middleman.  For example, a homeowner who hires a
housepainter who charges by the hour and does not invoice the homeowner separately
cost of materials cannot be considered the "direct purchaser" of the paint used by
housepainter.
    Second, attorneys do profit, albeit indirectly, from their purchase of their c
hospital record photocopies.  That is, they earn a contingent fee at the end of a
successful action. Moreover, even if the attorneys failed to profit (or even if the
suffered a loss) on the transaction, this fact does not transform their clients int
direct purchasers.  For example, in the previous hypothetical, the homeowner would
be considered an indirect purchaser even if the housepainter had charged a fee
insufficient to recoup the costs of the paint job or if the housepainter had charge
fee at all.

18

We are unpersuaded by plaintiffs' argument and find <u>In re Toilet Seat Antitrus</u>

<u>Litigation</u>, the single case relied upon by the plaintiffs in support of their agenc

theory, to be inapposite. That case involved an alleged conspiracy by toilet seat

manufacturers to fix the price of wood-flour toilet seats. <u>See</u> <u>In re Toilet Seat An</u>

<u>Litig.</u>, 387 F. Supp. 1342, 1343 (J.P.M.L. 1975). One of the plaintiffs, Harvey Lum

Company, purchased toilet seats through a purchasing agent, Biddle Purchasing Compa

which actually placed the order for the toilet seats at a price approved by Harvey.

Biddle received a flat monthly fee, unrelated to the quantity of toilets ordered, a

no inventory. <u>In re Toilet Seat Antitrust Litigation</u>, 1977-2 Trade Cases ¶ 61,601,

72,496. The district court concluded that under these limited circumstances, Harve

direct purchaser of the toilet seats and had standing to bring an antitrust claim.[0]

at 72,496-97.

In the present case, in contrast, none of the plaintiffs retained their lawyer

act as mere purchasing agents whose sole objective and function was to buy photocop

the clients. Rather, each client hired his or her attorney to file a lawsuit on hi

her behalf and to protect the client's legal interests. Moreover, a fair reading o

record reveals that the lawyers purchased the photocopies for their own use in

representing their clients. The attorneys, and not the clients, were undeniably th

direct purchasers of the photocopies.

Furthermore, the fact that the costs of the photocopies were passed on to the

on a dollar for dollar basis (at least where the attorney obtained a recovery on be

---

[0]The district court relied on the dictum in footnote 16 of <u>Illinois Brick</u>, which st
"Another situation in which market forces have been superseded and the pass-on defe
might be permitted is where the direct purchaser is owned or controlled by its cust
<u>Illinois Brick</u>, 431 U.S. at 736 n.16 (citing <u>Perkins v. Standard Oil Co.</u>, 395 U.S.
648 (1969) and <u>In re Western Liquid Asphalt Cases</u>, 487 F.2d 191, 197, 199 (9th Cir.
<u>cert. denied</u>, 415 U.S. 919 (1974)). Because Harvey "controlled" Biddle's actions
regarding purchases made on Harvey's behalf, the district court "view[ed] the relat
between Harvey and Biddle as falling within the above exception." <u>In re Toilet Seat</u>
<u>Antitrust Litigation</u>, 1977-2 Trade Cases ¶ 61,601, at 72,497.

the client) is not dispositive.[0]  Indeed, the subcontractors in <u>Illinois Brick</u> and

utility companies in <u>Utilicorp</u> passed on their costs to the plaintiffs in those res

cases; yet the Supreme Court deemed this fact insufficient to confer standing to th

indirect-purchaser plaintiffs in those cases.

Plaintiffs attempt to distinguish these precedents by characterizing the middl

those cases as "independent contractors."  Plaintiffs take the position that the at

in the present case, in contrast, are agents and not independent contractors.

It is, of course, beyond cavil that the attorney-client relationship is an age

principal relationship.  However, attorneys are also independent contractors as wel

agents. <u>See</u> Restatement (2d) Agency § 14N (1958) ("One who contracts to act on beha

another and subject to the other's control except with respect to his physical cond

an agent and also an independent contractor."); <u>id.</u> § 14N comment a ("[M]ost of the

persons known as agents, that is, brokers, factors, <u>attorneys</u>, collection agencies,

selling agencies <u>are independent contractors</u> . . . .") (emphasis added); 41 Am. Jur

<u>Independent Contractors</u> § 4 (1995) ("[F]or example, <u>attorneys at law</u> . . . and othe

similar persons . . . are agents, although as to their physical activities they <u>are</u>

<u>independent contractors</u> . . . .") (emphasis added); <u>see also</u> <u>Commonwealth v. Minds</u>

<u>Mining Corp.</u>, 60 A.2d 14, 20 (Pa. 1948) (adopting Restatement definitions of indepe

contractor).

An agent may be either an independent contractor or a servant (or employee in

day parlance).  <u>See</u> Restatement (2d) Agency § 2 comment b (1958) ("An agent who is

servant is, therefore, an independent contractor when he contracts to act on accou

the principal.").  Therefore, the relevant inquiry here is not whether a principal-

---

[0]Plaintiffs are no more direct purchasers of the hospital record photocopies at iss
than a passenger in a taxicab would be considered a direct purchaser of the gasolin
by the taxicab to carry the passenger to his destination.  Moreover, even if a sepa
charge for gasoline were assessed, the taxi passenger still could not be considered
direct purchaser in any sense.

relationship exists between clients and their attorneys, but whether attorneys are

independent contractors or mere employees. Although there are a number of factors

relevant to this inquiry, see Restatement (2d) of Agency § 220 (1958), the most imp

factor is the degree of control exercised by the principal:

> The legal distinction between an employee and an independent contractor is so
> well established as to require little, if any, discussion. The characteristic
> of the former relationship is that the master not only controls the result of
> the work but has the right to direct the way in which it shall be done, wherea
> the characteristic of the latter is that the person engaged in the work has th
> exclusive control of the manner of performing it, being responsible only for t
> result.

Feller v. New Amsterdam Cas. Co., 70 A.2d 299, 300 (1950). See also Moon Area Sch.

v. Garzony, 560 A.2d 1361, 1367 (Pa. 1989); Hammermill Paper Co. v. Rust Eng'g Co.,

A.2d 389, 392 (Pa. 1968).

It is clear that attorneys exercise "exclusive control of the manner of perform

[their legal work], being responsible [to the client] only for the result." Feller

A.2d at 300.

Furthermore, plaintiffs here are not even directly liable for the cost of the

photocopies. Except for McCarthy, plaintiffs are liable only if their attorneys su

in achieving a recovery on their behalf. Indeed, three of the contingent-fee agree

do not impose a separate charge for litigation costs; rather, the attorneys are rei

out of their percentage share of the settlement or award.

In McCarthy's case, although the retainer agreement does indicate that she is

responsible for costs irrespective of the outcome, her attorney acknowledged that i

actual practice, his law firm never charged clients unless the firm obtained a reco

Furthermore, McCarthy faces another insurmountable obstacle: her attorney never pa

photocopying charges but rather obtained the needed copies from opposing counsel.

Therefore, McCarthy (and indeed, even her attorney) cannot show any injury -- much

antitrust injury.

21

Based on these undisputed facts, we must conclude that the clients are not dir

purchasers.[0]  And unless an exception to the "direct purchaser" principle applies h

the plaintiffs have no standing to assert their antitrust claim under count I.


D.

Plaintiffs argue, in the alternative, that Illinois Brick does not apply here

they fall within the "co-conspirator" exception to the direct purchaser rule.  Citi

Link, 788 F.2d at 918, and In re Brand Name Prescription Drugs Litigation, 867 F. S

1338 (N.D. Ill. 1994), plaintiffs advance the proposition that indirect buyers have

standing to bring an antitrust claim against defendants who are co-conspirators in

vertical antitrust conspiracy.  To the extent that these cases recognize a co-consp

exception, however, we hold that plaintiffs have failed to establish the applicabil

such an exception to the facts at hand.

Preliminarily, we reject plaintiffs' reading of Link as establishing an except

Illinois Brick where the middlemen, from whom the plaintiffs made purchases, partic

---

[0]The attorneys are the real parties in interest.  Indeed, as noted previously, the
district court offered the plaintiffs' attorneys an opportunity to substitute thems
as the plaintiffs of record.  Although the defendants did not object to the distric
court's proposal, the attorneys for the plaintiffs declined the court's offer, choo
instead to appeal the district court's adverse ruling as to standing.

We acknowledge that generally an attorney is to be considered the agent of the
client, and as such, would not be held personally liable for expenditures made for
disclosed principal.  See Messenger Publishing Co. v. Walkinshaw, 157 A. 18 (Pa. Su
Ct. 1931).  However, the Pennsylvania Supreme Court has yet to address this subject
there is a wealth of authority that an attorney ordering goods or services in conne
with litigation, as is the case here, ordinarily be treated as a principal and henc
be liable for such expenses.

Even the lower courts in Pennsylvania, whose decisions are not binding on us,
had difficulty with this issue.  See Pessano v. Eyre, 13 Pa. Super. 157 (1900).  Bu
neither the cases revealed by the parties' research nor those revealed by our own r
have discussed this issue in the context of a federal antitrust action, such as we
here.  In none of those cases was the Illinois Brick direct purchaser rule at issue
are satisfied that in the instant antitrust context, the attorney-appellants do not
standing to prosecute this action.

in a vertical antitrust conspiracy.  To the contrary, in <u>Link</u>, we expressly refuse

adopt such an exception where the alleged co-conspirators immediately upstream were

also joined as codefendants:

> Alternatively, appellants argue that this court should carve out a narrow
> exception to <u>Illinois Brick</u> in vertical conspiracies where the intervening
> parties in the distribution process are named as co-conspirators (a so-called
> "co-conspirator exception").  <u>We decline to recognize this exception where, as
> here, the alleged co-conspirators are not also joined as co-defendants.</u>

<u>Link</u>, 788 F.2d at 931 (citations omitted) (emphasis added).

Similarly, in <u>Brand Name</u>, although the district court did allow the plaintiff

retailers of pharmaceutical drugs to sue both the manufacturers and the wholesalers

did so on the basis that the plaintiffs had alleged that the parties <u>immediately up</u>

(i.e. the wholesalers) had colluded with the manufacturers to fix prices.  The pla

had not alleged that overcharges were <u>passed on</u> but rather that the wholesalers, as

of a price-fixing conspiracy, had <u>directly</u> imposed an overcharge on the plaintiff

retailers.  <u>See</u> <u>Brand Name</u>, 867 F. Supp. at 1344.

Most significantly, the district court in <u>Brand Name</u> emphasized that the reaso

had not granted summary judgment in favor of the manufacturer-defendants was becaus

plaintiffs ha[d] named [as defendants] a large percentage of all possible [wholesa]

had allegedly participated in the conspiracy]." <u>Id.</u> at 1346.  The district court de

to "penalize[] [the plaintiffs] for the failure to join every single [w]holesaler

[involved in the alleged conspiracy] . . . ." <u>Id.</u>

Plaintiffs here posit that they have joined all of the co-conspirators in the

conspiracy (i.e. the Hospital defendants and the Copy Service defendants).  Reasoni

they have thereby satisfied the requirements of the co-conspirator exception, plain

argue that they should therefore be accorded standing to bring an antitrust claim e

though they are not direct purchasers.  We cannot agree.

23

Plaintiffs misconstrue <u>Brand Name</u> and <u>Link</u>, and misconceive the nature of the

conspirator exception.  In order to fall within the exception, plaintiffs here woul[d]

to allege that the intermediaries <u>immediately upstream</u>, that is, the attorneys, col[luded]

with the defendants to overcharge plaintiffs for the photocopies.  Moreover, plaint[iffs]

would be obliged to join the lawyers as defendants, which they have not done.  In s[um,]

co-conspirator exception does not apply here.


E.

Plaintiffs also suggest that the present case falls within the "pre-existing c[ost]

plus contract" exception to the direct purchaser rule.  This exception arises from [dictum]

in <u>Hanover Shoe</u>:

> We recognize that there might be situations--for instance, when an overcharge[d]
> buyer has a pre-existing "cost-plus" contract, thus making it easy to prove th[at]
> he has not been damaged--where the considerations requiring that the passing-o[n]
> defense not be permitted in this case would not be present.

<u>Hanover Shoe</u>, 392 U.S. at 494.

The vitality of the "pre-existing cost-plus contract" exception is doubtful, h[owever,]

in light of <u>Utilicorp</u>.  The Supreme Court, in that case, expressly refused to recog[nize an]

exception to <u>Illinois Brick</u> even where one hundred percent of the cost increases ha[d been]

passed through to indirect purchasers. <u>Utilicorp</u>, 497 U.S. at 216.

Moreover, even if this exception survived <u>Utilicorp</u>, plaintiffs have failed to [show]

that they meet the prerequisites of this exception.  Specifically, plaintiffs have [failed]

to show the existence of a <u>pre-existing</u> agreement to purchase a fixed quantity of

photocopies from the attorneys.  <u>See</u> <u>Mid-West Paper</u>, 596 F.2d at 580.  In addition, [as]

discussed earlier, plaintiffs have failed to demonstrate that they must pay the ful[l cost]

of the copies since their liability for litigation costs is only contingent in natu[re.]

24

In sum, plaintiffs have failed to establish that any exception to the direct purchaser rule obtains.  Thus, we hold that plaintiffs lack standing to pursue thei antitrust claim (count I).

IV.

Significantly, antitrust standing principles apply equally to allegations of F violations.  See Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 270 (1992) precepts taught by Illinois Brick and Utilicorp apply to RICO claims, thereby denyi standing to indirect victims.  Wooten v. Loshbough, 951 F.2d 768, 770 (7th Cir. 199 County of Oakland v. City of Detroit, 866 F.2d 839, 851 (6th Cir. 1989), cert. deni U.S. 1003 (1990); Carter v. Berger, 777 F.2d 1173, 1176 (7th Cir. 1985); Terre Du I Ass'n v. Terre Du Lac, Inc., 772 F.2d 467, 473 (8th Cir. 1985), cert. denied, 475 U 1082 (1986); Daley's Dump Truck Serv., Inc. v. Kiewit Pac. Co., 759 F. Supp. 1498, (W.D. Wash. 1991), aff'd sub. nom., Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2c (9th Cir. 1992), cert. denied, 113 S. Ct. 1644 (1993).  Indeed, plaintiffs have con that, if they lacked antitrust standing, they also lacked RICO standing. See Plaint Motion to Secure Certification (Nov. 29, 1994), at 3-4 (App. at 1168-69).

Hence, the central and dispositive issue is whether plaintiffs are "direct purchasers."  If so, they are entitled to pursue both their antitrust and RICO clai not, and insofar as damages are concerned, the district court properly granted summ judgment in favor of the defendants.

25

V.

Finally, plaintiffs argue that even if they lack standing to recover damages u

section 4 of the Clayton Act,[0] they may still seek injunctive relief under section

the Act.[0]

Standing analysis under section 16 is not identical to that for section 4.  Se

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 111 n.6 (1986).  "Section

been applied more expansively, both because its language is less restrictive than t

§ 4 . . . and because the injunctive remedy is a more flexible and adaptable tool f

enforcing the antitrust laws than the damage remedy . . . ."  Schoenkopf v. Brown &

Williamson Tobacco Corp., 637 F.2d 205, 210 (3d Cir. 1980).  Most importantly, "bec

standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries

the concerns voiced in Illinois Brick], some of the factors other than antitrust in

that are appropriate to a determination of standing under § 4 are not relevant unde

16."  Cargill, 479 U.S. at 111 n.6.

In Mid-West Paper, we expressly rejected the contention that the direct purcha

rule bars injunctive relief under section 16 as well as a treble damages suit under

section 4.  We explained that
> in contrast to the treble damage action, a claim for injunctive relief does no
> present the countervailing considerations--such as the risk of duplicative or
> ruinous recoveries and the spectre of a trial burdened with complex and

---

[0]Section 4 of the Clayton Act allows for recovery of treble damages in a private an
action:

> [A]ny person who shall be injured in his business or property by reason of
> anything forbidden in the antitrust laws may sue therefor . . . and shall
> recover threefold the damages by him sustained, and the cost of suit, includin
> a reasonable attorney's fee.

15 U.S.C. § 15(a).

[0]Section 16 provides in relevant part:

> Any person . . . shall be entitled to sue for and have injunctive relief . . .
> against threatened loss or damage by a violation of the antitrust laws.

15 U.S.C. § 26.

conjectural economic analyses--that the Supreme Court emphasized when limiting
the availability of treble damages.

Mid-West Paper, 596 F.2d at 590.  See also Merican, 713 F.2d at 962 n.6; In re Beef

Antitrust Litig., 600 F.2d 1148, 1167 (5th Cir. 1979), cert. denied, 449 U.S. 905 (

We cautioned that
the rule of standing urged by the defendants, which would completely bar
indirect purchasers from seeking injunctive relief, would leave a serious gap
the antitrust enforcement scheme, as the fate of these injured parties, and of
the competitive economy in an entire industry, would be made dependent upon th
willingness of the government and the direct purchasers to assume the burdens
a lengthy lawsuit.

Mid-West Paper, 596 F.2d at 593-94.

Although plaintiffs need not satisfy Illinois Brick's "direct purchaser" requi

in order to seek injunctive relief, they must still make a threshold showing of

entitlement to injunctive relief.  That is, plaintiffs must show: (1) threatened l

injury cognizable in equity; (2) proximately resulting from the alleged antitrust

violation.  City of Rohnert Park v. Harris, 601 F.2d 1040, 1044 (9th Cir. 1979), ce

denied, 445 U.S. 961 (1980); Central Nat'l Bank v. Rainbolt, 720 F.2d 1183, 1186 (1

Cir. 1983).  Because the district court never considered whether plaintiffs would b

entitled to injunctive relief under section 16, separate and apart from the Illinoi

standing rule, we will remand to allow the district court to undertake such an anal

VI.

For the foregoing reasons, we will affirm the district court's grant of summar

judgment in favor of the defendants on plaintiffs' treble-damages claim (count I) a

claim (count II),[0] but we will reverse as to plaintiffs' claim for

---

[0]Count III, the civil rights claim, was dismissed by the district court and is not
appeal before us.

injunctive relief and remand for further proceedings consistent with this opinion.[0]

MARY RUTH MCCARTHY, ET AL. V. RECORDEX SERVICE, INC., ET AL.

NO. 95-1005

STAPLETON, J., Concurring in part and dissenting in part:


As the court acknowledges, it is "beyond cavil that the attorney-client relati
is an agent-principal relationship." (Majority Op. at 25.)  Nevertheless, the court
declares that the "attorneys [in this case], and not the clients, were undeniably t
direct purchasers of the photocopies."  (Majority Op. at 24.) The first of these
inconsistent propositions is clearly correct; it necessarily follows that the secor
not.  Because the photocopies were purchased from the defendant copy services by th
attorneys, as agents for their disclosed client-principals, it is the clients, and
attorneys, who purchased them. For this reason, I would reverse the judgment of the
district court and remand for further proceedings on all of the plaintiffs' claims.


I.

In part III-B, the court concludes that: (1) the Supreme Court in Associated C
Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S.
(1983) [hereinafter AGC], neither overruled Illinois Brick Co. v. Illinois, 431 U.S
(1977), nor limited its application; (2) "AGC incorporates, rather than repudiates,

---

[0]Although the injunctive relief issue was only perfunctorily briefed and discussed,
seriously question whether the issue can be successfully pursued.  We note, for ins
that plaintiffs apparently have obtained all of the medical records relevant to the
particular personal injury claims, and there is little, if any, likelihood that pla
will request additional copies of those records from the defendants. Moreover, it i
highly doubtful that additional hospital records pertaining to plaintiffs' personal
claims will be generated.  Nevertheless, because our precedents require that a clai
an injunction under section 16 be treated differently than a claim for treble damag
under section 4, it is appropriate that the district court, rather than this Court,
consider the merits of the claim for injunctive relief in the first instance.

principles of <u>Illinois Brick</u>," (Majority Op. at 19;) (3) <u>AGC</u> and <u>Illinois Brick</u> add[...]
two distinct aspects of antitrust standing; and (4) in order to escape summary judg[...]
the plaintiffs must establish that they and not their attorneys are the direct pur[...]
of the photocopies.  I agree.

Whether the plaintiffs are direct purchasers of the copies, however, depends o[...]
whether the attorneys are agents for the plaintiffs with respect to the purchase of [...]
copies.  If the attorneys bought the copies as agents for the plaintiffs, then the [...]
plaintiffs are the direct purchasers of the copies.  If, on the other hand, the att[...]
purchased the copies on their own behalves, then the plaintiffs are indirect purcha[...]
the copies.  When the applicable law is applied to the facts reflected in the summa[...]
judgment record, the conclusion is inescapable that the attorneys purchased the cop[...]
their clients and that the clients are the direct purchasers.

A.

In Pennsylvania, the elements of agency are "the manifestation by the principa[...]
the agent shall act for him, the agent's acceptance of the undertaking and the
understanding of the parties that the principal is to be in control of the undertak[...]
<u>Scott v. Purcell</u>, 415 A.2d 56, 60 (Pa. 1980) (quoting <u>Restatement (Second) of Agenc[...]</u>
Comment b (1958)). When a lawyer undertakes to represent a client, he consents to t[...]
client's having control of the representation even though he may be expected to exe[...]
professional judgment with respect to the means of pursuing the objectives of the
representation. Pennsylvania Rules of Professional Conduct 1.2(a).  For this reason[...]
attorney-client relationship, as the court acknowledges, is generally regarded as a[...]
agency relationship. As a principal, the client is bound by the actions of the atto[...]
the course of the representation.  As an agent, the attorney, like other agents, is[...]
fiduciary and owes to his client-principal a duty of care, obedience, and loyalty. [...]
<u>Restatement (Second) of Agency</u> §§ 377-398; <u>e.g.</u>, Pennsylvania Rules of Professional[...]
Conduct 1.1, 1.2, 1.3, 1.15.  In particular, an attorney who obtains tangible prope[...]

29

the course of carrying out the agency owes to his client-principal a duty to exerci

reasonable care in its protection, to use it only in accordance with the directions

principal and for his benefit, and to surrender it upon demand on the termination o

agency.  Id. § 422; Pennsylvania Rules of Professional Conduct 1.15, 1.16(d).  Whil

attorney may have a lien to secure any unpaid compensation, it is only a lien and a

tangible property obtained or created in the course of the representation belongs t

client-principal.  Pennsylvania Rules of Professional Conduct 1.16(d).

The record here reflects typical attorney-client relationships between the pla

and their attorneys.  The attorneys agreed to represent the plaintiffs in their per

injury suits and thus to obtain on their behalf the goods and services necessary to

prosecute those suits.[0]  Although the attorneys, as permitted by Pennsylvania's Rul

Professional Conduct,[0] are _advancing_ to their clients the expenses associated with

litigating their cases, this does not, in my view, alter the relationship between t

attorneys and their clients or between the clients and third parties with whom the

attorneys deal on the clients' behalf.  By contrast, nothing in the record suggests

the attorneys are purchasing the records on their own behalves in the hope of makin

profit on resales to their clients.

The attorneys' role as agent is controlling here because, unless otherwise agr

agent for a disclosed principal is not a party to a contract that the agent enters

---

[0]  Of course, it is understood that an attorney obtains goods used generally in his
practice, such as office supplies, on his own behalf.  Office supplies are analogou
the paint purchased by a housepainter or the gasoline purchased by a taxicab driver
court's hypotheticals.  (See Majority Op. at 22 n.15; 24 n.17.)

[0]  Pennsylvania's Rules of Professional Conduct 1.8(e) provides:

   (e) A lawyer shall not provide financial assistance to a client in
connection with pending or contemplated litigation, except that:

      (1) a lawyer may advance court costs and expenses of litigation, the
   repayment of which may be contingent on the outcome of the matter; and

      (2) a lawyer representing an indigent client may pay court costs and
   expenses of litigation on behalf of the client.

30

behalf of the principal. Restatement (Second) of Agency § 320 (followed in Revere
Inc. v. Blumberg, 246 A.2d 407, 409 (Pa. 1968)). Thus, unless it is agreed that suc
agent is to be a party to a contract, the contract is, in effect, a contract betwee
principal and the third party. Restatement (Second) of Agency §292 (followed in Hi
Apartments, Inc. v. NYCE Crete Co., 352 A.2d 148, 154 (Pa. Super. Ct. 1975)).
Accordingly, where, as here, an attorney purchases photocopies of records and it is
understood by the seller that they are being purchased on behalf of his client, the
and not the attorney is the purchaser. My review of Pennsylvania case law convinces
that Pennsylvania subscribes to these basic principles of agency in the context of
attorney-client relationship.

In Moore v. Porter, 13 Serg. & R. 100 (Pa. 1825), the Supreme Court of Pennsyl
addressed the remedies available to a prothonotary to collect fees incurred by liti
The court held that "[t]he party for whom the services are done, is responsible for
fees, and to him is the [prothonotary] to look. . . . The fees are not chargeable
attorney of the party for whom the services are done, unless he has become security
the costs." Id. at 101.

Pessano v. Eyre, 13 Pa. Super. 157 (1900), involved a suit by an expert witnes
against the attorney that hired him in pursuit of his client's claim. The superior
held that "[i]f . . . there was no express direct undertaking on the part of the
[attorney] to pay what was due to the [expert witness], that is the end of the matt
because the expert witness could not collect from the attorney. Id. at 163. The a
would be liable to the expert witness only if the attorney "ma[de] himself liable b
special promise." Id.[0]

---

[0] The court concludes that in Pessano v. Eyre, 13 Pa. Super. 157 (1900), the super
court "had difficulty with this issue." (Majority Op. at 27 n.18.) I am not sure o
difficulty the court speaks. On the contrary, the superior court in Pessano plainl
articulates the principle that while an agent is not generally liable on a contract
on behalf of a disclosed principal, "even where the agency is known, an agent . . .
render himself liable by an express undertaking." Pennsylvania R. Co. v. Gallagher

31

In Messenger Publishing Co. v. Walkinshaw, 157 A. 18 (Pa. Super. Ct. 1931), th

superior court held that where an attorney orders copies of "a paper book used on a

from a publishing company, the attorney does so in his capacity as an agent for his

client.  As the court explained:

> When an attorney has been acting for the defendant up to judgment and the clie
> with him in the taking of an appeal and the attorney orders the printing of th
> paper-books required by the rules of the appellate court, it is to be presumed
> he is acting under authority from his client.  At least, the ordering of the p
> books is within the scope of the attorney's authority.

Id. at 19 (quoting Huntzinger v. Devlin, 80 Pa. Super. Ct. 187 (1922)).  Thus, the

publishing company, the court held, could not collect from the attorney.

Based on Moore, Pessano, Walkinshaw, and Huntzinger, I conclude that in Pennsy

"when an attorney contracts with a third party for the benefit of a client for good

services to be used in connection with the attorney's representation of a particula

client and the third party is aware of these facts, the attorney is not liable on t

contract unless he either expressly or impliedly assumes some type of special liabi

Eppler, Guerin & Turner, Inc. v. Kasmir, 685 S.W.2d 737, 738 (Tex. Ct. App. 1985).[0]

Numerous jurisdictions agree.  See Christensen, O'Connor, Garrison & Havelka v. Sta

Washington, Department of Revenue, 649 P.2d 839, 843 (Wash. 1982); Hasbrouck v. Krs

P.2d 1197, 1198 (Mont. 1975); In re May, 261 N.E.2d 109, 110 (N.Y. 1970); Kates v.

Millheiser, 569 So.2d 1357, 1357 (Fla. Dist. Ct. App. 1990); Free v. Wilmar J. Helr

688 P.2d 117, 119-20 (Or. Ct. App. 1984); Weeden Engineering Corp. v. Hale, 435 So.

---

A.2d 401, 402 (Pa. Super. Ct. 1953).  In the record in this case, there is no evide
an express undertaking of liability by the attorneys.  Moreover, the fact that the
attorney may commit himself to be responsible to the seller for the purchase price
not mean that the client is not also responsible or that any property purchased in
sale on behalf of the client does not belong to the client.

[0]  The court intimates that Pennsylvania case law may be inapposite because no
Pennsylvania case discusses the agency issue in a federal antitrust context and nor
address the direct purchaser rule.  (See Majority Op. at 27 n.18.)  In my view, thi
distinction is not significant because the agency status of the attorneys is purely
question of state law.  The court does not suggest a reason why the agency question
turn out differently in the federal antitrust context, and I perceive none.

32

1158, 1160 (La. Ct. App. 1983); <u>Petrando v. Barry</u>, 124 N.E.2d 85, 87 (Ill. Ct. App.

7A C.J.S. <u>Attorney and Client</u> § 140 (1980) ("In the absence of assumption of person

liability, an attorney is generally not liable for work done by third persons in

connection with his representation of a client.").

Under this case law, the plaintiff-clients, and not their attorneys, are respo

for the purchase price of the photocopies.  Moreover, the record reflects that they

had to pay in the past[0] and will continue to have to pay in the future[0] the prices t

copy services choose to charge. Assuming that an antitrust violation has affected t

prices that the copy services charge, I fail to understand how there could be a mor

direct causal relationship between that violation and the plaintiffs' alleged injur

B.

The court concludes that because the attorneys are independent contractors wit

respect to the purchase of the copies, the attorneys, rather than the plaintiffs, a

direct purchasers of the copies.  The issue of whether the attorneys are independen

contractors is simply not relevant here, however. Independent contractor status is

relevant only to determine the extent of a principal's tort liability to third part

According to the law of <u>respondeat superior</u>, where B acts for the benefit of A and

a tort and injures C, if B is an independent contractor, then C cannot recover from

regardless of whether B is A's agent.  If, on the other hand, B is a servant of A,

can recover from A regardless of whether B is A's agent.  Thus, even if it be true

the plaintiffs' attorneys are independent contractors, all this tells us is that th

plaintiffs are not responsible to third parties for torts committed by the attorney

---

[0] As the court acknowledges in footnote 6, plaintiffs Thomasetti and Hoffman have
their attorneys' advances.

[0] Even if one credits the testimony that F&S chooses not to press its contract rig
reimbursement in unsuccessful cases, it is clear that the clients will wind up payi
purchase price of the photocopies in all successful cases.

33

tells us nothing about whether the attorneys, as their agents, purchased the copies

their behalves.  See Restatement (Second) of Agency §§ 2, 219-220.


II.

Because antitrust standing principles apply equally to allegations of RICO

violations, I would conclude, for the foregoing reasons, that the plaintiffs may go

forward on their RICO damage claims.  Because I agree with the court that the plain

have standing to prosecute their claim for injunctive relief under Section 16 of th

Clayton Act, I would remand for further proceedings on all of plaintiffs' claims.

34